UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-10083-FDS

SHEKEIRA WILLIAMS, et al., pro se,
 Plaintiffs,

  v.

LUIS SPENCER, Commissioner, et al.,
 Defendants.

## MASSACHUSETTS DEPARTMENT OF CORRECTION DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

The Massachusetts Department of Correction ("Department") defendants,

Commissioner Luis Spencer ("Commissioner Spencer"); Souza-Baranowski Correctional

Center ("SBCC") Superintendent Bruce Gelb ("Superintendent Gelb"); Director of

Security Brian McDonald ("DOS McDonald");[1] Lieutenant Nestor Cruz ("Lieutenant

Cruz"); Sergeant Lawrence Amblo ("Sergeant Amblo"); and Correction Officer Lesley

Pierre  ("CO Pierre") (collectively as "Department Officials")[2] submit the following

Motion to Dismiss, or in the Alternative, for Summary Judgment.

## STATEMENT OF THE CASE

Pro se plaintiffs Donald Williams W97372 ("Williams") and Shekeira Springer

("Springer") (collectively as "Plaintiffs") are now apparently husband and wife.

Williams is an inmate lawfully incarcerated within the Department who is currently

confined at SBCC.  Springer was the girlfriend of Williams during the time relevant to

the instant Complaint and lives in Dorchester, Massachusetts.  (Compl. ¶¶ 1, 20.)

---

[1] At the time of this incident, DOS McDonald was a Captain.

[2] Named defendant Osvaldo Vidal has not been served in this matter and, therefore, is not a party to the instant action.  See Docket Sheet.

Plaintiffs commenced this lawsuit by the filing of a Complaint on January 14, 2013.  (Docket Sheet, Paper No. 1.)  In their Complaint, Plaintiffs allege violations of their civil rights under the state and federal constitutions.  Specifically, Plaintiffs allege that the Department Officials barred Springer from visiting Williams for one year without evidence of wrongdoing.  Plaintiffs also claim that Springer was unlawfully detained, searched, and humiliated by the Department Officials.  Plaintiffs claim violations of the Fifth, Eighth and Fourteenth Amendments of the Constitution as a result.  They further assert that the Department Officials have violated G.L. c. 127, §§ 36 and 37.  (Compl. ¶¶ 24-25.)

## STATEMENT OF UNDISPUTED FACTS

1.      Preventing the introduction of drugs into the Department's facilities is one of the Department's foremost priorities.  One of the ways in which the introduction of drugs occurs is through visitors.  Consequently, in response to an increase of drug and other contraband–related incidents involving visitors, the Department will now be using narcotic detection dogs in its facilities.  As set forth in the Commissioner's statement on the Department's website regarding the use of narcotic detection dogs:

> Drugs in prison contribute to violence, compromise the health and safety of staff and inmates and hamper inmates' efforts to re-enter society addiction free.  The presence of illegal drugs in DOC facilities encourages further criminal behavior and the disciplinary consequences that result impede inmates' chances for parole and to step down to lower security levels.

(Gelb Aff., attached hereto as Ex. A, ¶ 3.)

2.      When an inmate is housed in a Special Management Unit ("SMU"), his visits occur in a non-contact SMU visiting room.  (Ex. A, ¶ 4.)

3.      Visits in the SMU visiting rooms are scheduled 24 hours in advance on the

following days:  Sundays, Wednesdays, and Fridays.  SMU visits occur during the

following time periods:  9 a.m. to 10 a.m.; 10 a.m. to 11 a.m.; 1 p.m. to 2 p.m.; 7 p.m. to

8 p.m.; and 8 p.m. to 9 p.m.  (Ex. A, ¶ 5.)

4.      At that time, SMU visiting rooms were routinely inspected before and after each

visiting group.  In addition, the SMU visiting rooms and other common areas are

inspected for contraband and other security issues at the beginning of each shift.   Thus,

one of the times that the SMU visiting rooms are inspected is on or about 3 p.m.,

following shift change, i.e., before the evening SMU visits begin.  (Ex. A, ¶ 6.)

5.      On Sunday June 3, 2012 Springer entered SBCC for a 7 p.m. visit with Williams.

(Ex. A, ¶ 7.)

6.      Because Williams was housed at that time in the J3 SMU, his visit with Springer

on that evening occurred in the South-SMU ("SSMU") visiting room.  (Ex. A, ¶ 8.)

7.      The SSMU visiting room has three booths.  Thus, it can accommodate three visits

during each time period.  After being processed, the visitors are escorted to the SSMU

visiting room by a Correction Officer.  There is no Correction Officer present in the room

during the visits.  (Ex. A, ¶ 9.)

8.      According to the Department's records, the following transpired:  On June 3,

2012 at approximately 7:50 p.m., two visits were being held in the SSMU.   A female

visitor ("Visitor One") was seated at visit booth # 1 visiting with an inmate.  Springer

was seated at booth # 2 visiting with Williams.  The door to the SSMU was closed.

While these two visits were in progress, CO Pierre opened the SSMU visiting room door

to allow a third visitor ("Visitor Three") to enter for a visit.  Upon pulling out the chair to

booth # 3 for Visitor Three, CO Pierre observed a package on top of the chair.  He

opened the package, which contained a plastic baggie filled with a green leafy substance

(consistent with marijuana) and two smaller bags with approximately 60 individually

wrapped orange pills (consistent with Suboxone).  The visits were terminated.  Visitor

One and Springer were informed by Inner Perimeter Security ("IPS") Officer Wozniak

that they needed to come with him for questioning.  All three visitors were escorted to the

lobby.  Visitor Three left the facility.  The State Police arrived and interviewed Visitor

One and Springer individually, with the assistance of IPS Officers Wozniak and Goden.

Both Visitor One and Springer were read their <u>Miranda</u> rights by the State Police.  Both

denied any involvement in the package found in the SSMU visiting room.  Both Visitor

One and Springer consented to a search of their vehicles.  Both vehicles were searched

with negative results.  Visitor One and Springer were informed that they were free to

leave the institution, however, they would not be allowed to enter any Department facility

until they were given permission from then Superintendent Mendonsa.  A search of the

SSMU visiting room resulted in the discovery of two more packages of contraband taped

to the underside of the desk in visit booth # 3.  (Ex. A, ¶ 10.)

9.       As a result of this incident, on June 4, 2012 then Superintendent Mendonsa barred

both Visitor One and Springer from visiting any Department correctional institution or

facility for one year.  (Ex. A, ¶ 11.)

10.      Both Visitor One and Springer appealed the visitation bars.  On June 26, 2012

Superintendent Gelb denied both appeals, based upon the seriousness of the incident, the

introduction of drugs into SBCC; and because the matter was currently under

investigation.  (Ex. A, ¶ 12.)

11.      On May 6, 2013 Springer resubmitted her request for reinstatement, which

Superintendent Gelb allowed, effective June 4, 2013.  (Ex. A, ¶ 13.)

12.     Because the Department was unable to ascertain who introduced the drugs into

the facility, Superintendent Gelb did not refer this incident to the District Attorney's

Office.   (Ex. A, ¶ 14.)

13.     Although Springer was barred from visiting Williams for a period of one year, she

and Williams were able to communicate by way of telephone and/or mail.  (Ex. A, ¶ 15.)

## ARGUMENT

### I.     STANDARD OF REVIEW

A motion to dismiss the complaint must be construed in the light most favorable

to the plaintiff and its allegations taken as true.  Hugh v. Rowe, 449 U.S. 5, 10 (1980).

To survive a motion to dismiss, a complaint must contain factual allegations "enough to

raise a right to relief above the speculative level ... on the assumption that all the

allegations in the complaint are true."  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965

(2007).  To withstand a motion to dismiss, the plaintiff must "set forth minimal facts, not

subjective characterizations, as to who did what to whom and why."  Dewey v.

University of New Hampshire, 694 F.2d 1, 3 (1st Cir. 1982), cert. denied 461 U.S. 944

(1983).  Although the threshold for stating a claim may be low, it is real.  Gooley v.

Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988).

In the alternative, summary judgment is appropriate against a party who "fails to

make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986).  A non-moving party cannot rest on mere allegations;

the non-moving party must adduce specific, provable facts that establish that there is a

triable issue.  <u>Rogers v. Fair</u>, 902 F.2d 130, 143 (1st Cir. 1990).  Summary judgment is

mandated when the party who has the burden of proof at trial "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  <u>Celotex Corp.</u>, 477 U.S. at 322.

The party moving for summary judgment is not required to negate the opposing party's

claim by producing affirmative evidence disproving that essential element; the moving

party must only show that there is an absence of evidence by which the non-moving party

can prove its case.  <u>Id.</u> at 325.

      In order to defeat a motion for summary judgment, therefore, a plaintiff must

demonstrate a genuine issue of material fact on every element essential to his case in

chief.  A genuine issue is one where the party opposing summary judgment provides

evidence "such that a reasonable jury could return a verdict for the nonmoving party."

<u>Daury v. Smith</u>, 842 F.2d 9, 11 (1st Cir. 1988).  A plaintiff is not allowed to rely upon

unreasonably speculative inferences, <u>see</u> <u>Mesnick v. General Elec. Co.</u>, 950 F.2d 816,

826 (1st Cir. 1991), but must present concrete evidence in support of the essential

elements of his case.  <u>Celotex</u> at 322.  "The mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which

the jury could reasonably find for the plaintiff."  <u>Anderson v. Liberty Lobby, Inc.</u> 477

U.S. 242, 248 (1986).  Furthermore, a party may not create a genuine issue of material

fact by presenting contradictory or unsupported statements.  <u>See</u> <u>Securities and Exchange</u>

<u>Comm'n v. Research Automation Corp.</u>, 585 F.2d 31, 31, 33 (2[d] Cir. 1978).  As set forth

below, Plaintiffs cannot provide evidence on any of their claims sufficient for a

reasonable jury to return a verdict in their favor.  Accordingly, each of the Department

Officials is entitled to judgment as a matter of law.

 Furthermore, the Department Officials are entitled to summary judgment on the

basis of qualified immunity, as the Department Officials' conduct did not violate any

constitutional right.  As made clear by the United States Supreme Court, qualified

immunity is the right to be free from suit rather than a mere defense to liability, and it is

effectively lost if a case is erroneously permitted to go to trial.  Puerto Rico Aqueduct and

Sewer Auth. v. Metcalf & Eddy, 506 U.S. 139, 144 (1993).

Because Plaintiffs have not stated any valid claims under federal or state law or

any constitutional claim, the Complaint must be dismissed.  Moreover, Plaintiffs' claims

are clearly frivolous, in that they lack an arguable basis in law or fact.

## II.      PLAINTIFFS HAVE NO § 1983 CLAIM FOR DAMAGES AGAINST THE DEPARTMENT OFFICIALS IN THEIR OFFICIAL CAPACITIES.

Plaintiffs' § 1983 claims against the Department Officials in their official

capacities must fail because it is well settled that a state, or in this case, a state agency,[3] is

not a "person" within the meaning of § 1983.  As the United States Supreme Court has

ruled:  "Section 1983 provides a federal forum to remedy many deprivations of civil

liberties, but it does not provide a federal forum to litigants against a State for alleged

deprivations of civil liberties."  Will v. Michigan Dep't of State Police, 491 U.S. 58, 66

(1989).  Accordingly, as a matter of law, the Department Officials in their official

capacities are immune from suit under § 1983.

---

[3]        Pursuant to the General Laws, the Department is an agency of the Commonwealth within the Executive Office of Public Safety and Security.  G.L. c. 6A, § 18.  Our courts have held that a claim against an agency or a public facility of the Commonwealth is, in effect, a claim against the Commonwealth. Woodbridge v. Worcester State Hosp., 384 Mass. 38, 38-39 n.3 (1981).

III.     **PLAINTIFFS FAIL TO STATE A § 1983 CLAIM AGAINST COMMISSIONER SPENCER UNDER THEORIES OF VICARIOUS LIABILITY AND RESPONDEAT SUPERIOR.**

Plaintiffs, by naming Commissioner Spencer as a defendant, apparently attempt to allege that Commissioner Spencer failed to correct the violative actions of the other named defendants regarding Plaintiffs' rights to visitation, thereby resulting in the alleged constitutional violations.  (Compl. ¶ 3.)  Plaintiffs fail to state a claim.

As a preliminary matter, an alleged violation of the Department's Visiting Procedure regulation does not rise to the level of a constitutional violation.  See Davis v. Sherer, 468 U.S. 193, 193-95 (1984); Jeneski v. City of Worcester, 476 F.3d 14, 17 (1st Cir. 2007) ("[A] violation of state law is not by itself a constitutional violation.") Plaintiffs' claims against Commissioner Spencer should be dismissed as there is no supervisory liability under 42 U.S.C. § 1983.  Section 1983 imposes liability on one who "subjects [a person], or causes [that person] to be subjected," to a deprivation of federal rights.  42 U.S.C. § 1983.  The United States Supreme Court has long held that this precise causation language precludes efforts to "impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor."  Monell v. Department of Social Serv., 436 U.S. 658, 694 (1978).  "Government officials may not be held liable for unconstitutional conduct of their subordinates under a theory of respondeat superior[.]  Because vicarious liability is inapplicable to Bivens and §1983 suits, a plaintiff must plead that each Government official defendant, through the official's own individual actions, has violated the constitution."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948 (2009).  These cases clearly stand for the proposition that supervisory

liability cannot be established in § 1983 actions on a theory of respondeat superior and that a government official is only liable for his or her own conduct.

In §1983 litigation, the liability of a public employer or a supervising official cannot be predicated on a theory of respondeat superior. Monell, 436 U.S. at 690-92; Gutierrez Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989) (citations omitted). In the absence of personal involvement, a supervisor is liable for the acts of a subordinate only if (1) the subordinate's behavior results in a constitutional violation and (2) the supervisor's action was "affirmatively linked" to the behavior only in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference. Hegarty v. Somerset County, 53 F.3d 1367, 1379-80 (1st Cir. 1995). Negligence is inadequate to establish supervisory liability. Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 92 (1st Cir. 1994). Plaintiffs must show that the supervisor acted with deliberate indifference, in addition to a causation requirement linking the supervisor's conduct to the subordinates' violative conduct. Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994); Febus-Rodriguez, 14 F.3d at 92 (supervisor's acts or omissions must amount to the reckless or callous indifference to the constitutional rights of others; i.e., that it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights).

Prison officials may not "be held personally responsible simply because [they were] in a high position of authority in the prison system." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); see also McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1978) ("The fact that [supervisory defendant] was in a high position of authority is an

insufficient basis for the imposition of personal liability").  "A causal link may … be forged if there exists a known history of widespread abuse sufficient to alert a supervisor to ongoing violations."  Cameron v. Fair, 887 F. Supp. 387, 391 (1995) (quoting Maldonado-Denis, 23 F.3d at 581-83).  The First Circuit has also held that when a supervisor is "on notice and fails to take corrective action, say by better training or closer oversight, liability may attach."  Id.  The Court went on to hold, however, that "isolated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference.  Id.

Plaintiffs fail to describe with any specificity what, if any, personal involvement Commissioner Spencer had in violating their constitutional rights relative to visitation. Plaintiffs merely name Commissioner Spencer within the case caption of the Complaint, and allege within its body that Springer wrote to him after receiving the notice that she was temporarily barred from visiting any of the Department's facilities.  (Compl. ¶¶ 3, 21.)  This claim is insufficient.  To state a claim against Commissioner Spencer, that he acquiesced and condoned the actions of the other named Department Officials, Plaintiffs must clearly identify the action or inaction Commissioner Spencer failed to take with regard to the remaining Department Officials and how it would have avoided any alleged violation of their rights.  See Iqbal, 129 S. Ct. at 1949-50.  Plaintiffs fail to identify any such action.  Plaintiffs cannot and do not establish a causal link with regard to their allegations against Commissioner Spencer.  Thus, Plaintiffs' § 1983 claims against Commissioner Spencer must be dismissed as a matter of law.

IV.     **PLAINTIFFS HAVE NO CLAIMS AGAINST COMMISSIONER SPENCER; DOS MCDONALD; LIEUTENANT CRUZ; SERGEANT AMBLO; AND CO PIERRE BECAUSE THE DETERMINATION TO BAR SPRINGER WAS MADE BY SUPERINTENDENT GELB.**

Plaintiffs' claims against Commissioner Spencer; DOS McDonald; Lieutenant Cruz; Sergeant Amblo; and CO Pierre must fail because none of these defendants made the determination to bar Springer.  (Ex. A, ¶ 10.)

Rather, it was then Superintendent Mendonsa who initially barred Springer and Visitor One from visiting any Department correctional institution or facility for one year as a result of the incident on June 3, 2012.  (Compl. ¶ 20; Ex. A, ¶¶ 8-9.)  When Springer and Visitor One appealed their visitation bars, it was Superintendent Gelb who made the final decision to deny them.  (Compl. ¶ 20; Ex. A, ¶ 10.)  Because the other named defendants were not involved with the determination regarding Springer's visitation privileges, Plaintiffs have failed to state any valid claims against them.  Accordingly, Plaintiffs' claims against defendants Commissioner Spencer; DOS McDonald; Lieutenant Cruz; Sergeant Amblo; and CO Pierre must be dismissed as a matter of law.

## V.   PLAINTIFFS' CONSTITUTIONAL RIGHTS WERE NOT VIOLATED BECAUSE THERE IS NO CONSTITUTIONAL RIGHT TO VISITATION.

Plaintiffs claim that the Department Officials violated their state and federal due process rights by suspending Springer's visitation privileges for one year.  (Compl. ¶¶ 24, 25.)  Plaintiffs' claims are without merit because there is no constitutional right to visitation.

An inmate does not have a due process right to unfettered visitation.  Kentucky Dep't. of Corrections v. Thompson, 490 U.S. 454, 460 (1989).  Likewise, a citizen does not have a right to unfettered visitation of an inmate that rises to a constitutional dimension.  See Wood v. Clemons, 89 F.3d 922, 928 (1st Cir. 1996) (citing Spear v. Sowders, 71 F.3d 626, 630 (6th Cir. 1995)).  While inmates "… may not be deprived of life, liberty, or property without due process of law," these protections are only triggered

where changes in the conditions of their confinement amount to a "sufficiently 'grievous loss.'" Olim v. Wakinekona, 461 U.S. 238, 252 (1983) (Marshall, J., dissenting) (citing Vitek v. Jones, 445 U.S. 480, 488 (1980)).  Actions of the prison administration, which do not bring about "'consequences … qualitatively different from the punishment characteristically suffered by a person convicted of [a] crime[,]'" implicate no such loss. Vitek, 455 U.S. at 493.  Since an inmate's right to visitation with a certain person is not within the terms of confinement ordinarily contemplated by a prison sentence, the denial of such is not protected by the Due Process Clause.  Thompson, 490 U.S. at 461. Accordingly, inmates and visitors do not have an inherent constitutional right to visitation.  See id.  Thus, unless the state creates a liberty interest protected by the Due Process Clause through its enactment of certain statutes or regulatory measures, prisons may limit prison visitation where there is evidence of a plan to engage, during such visits, in conduct endangering the facility or security.  Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 125-26 (1977); Wolff v. McDonnell, 418 U.S. 539, 556-57 (1974).

A.      **There Is No Statutory Right To Visitation.**

There is no state created liberty interest to unfettered visitation.  Except for certain public officials, ordinary citizens have no statutory right to visit the Commonwealth's prisons.  G.L. c. 127, § 36.  The statute provides, in pertinent part:

> No person except the governor, a member of the governor's council, a member of the general court, a justice of the supreme judicial, superior or district court, the attorney general, a district attorney, the commissioner, a deputy commissioner of correction, a member of the parole board, or a parole or probation officer may visit any of the correctional institutions of the commonwealth … without the permission of the commissioner or of the superintendent of such institution …

Id.  G.L. c. 127, § 37 provides that the superintendent may refuse admission to a person

who has permission to visit if, in the superintendent's opinion, such admission would be

injurious to the best interest of the institution.

**B.    There Is No Absolute Right To Visitation Under The Department's
Regulations.**

As a preliminary matter, the Department's Visiting Procedure regulation makes

clear that "103 CMR 483.00 is not intended to confer any private right of action or any

procedural or substantive rights not otherwise granted by state or federal law."  103 CMR

483.02.[4]

Furthermore, the Visiting Procedure regulation is not worded in such a way that

Plaintiffs could reasonably expect an absolute right to visitation that may be enforced

against the Department Officials.  Indeed, the Visiting Procedure regulation, Purpose

provides:

> The purpose of 103 CMR 483.00 is to establish rules and regulations
> governing visiting at state correctional institutions which reflect both the
> importance of prison visitation and the need for security and order in
> administering a visiting program.

103 CMR 483.01.  The Visiting Procedure regulation also provides:

> By statute (M.G.L. c. 127, § 37) the superintendent may refuse admission
> to a person who has permission to visit if, in the superintendent's opinion,
> such admission would be injurious to the best interest of the institution.

103 CMR 483.11(2).  See also 103 CMR 483.11(1) (citing G.L. c. 127, § 36).  The

Visiting Procedure regulation also provides:

> (1)  It is a felony in Massachusetts for any person to deliver any article
> whatsoever to an inmate without the permission of the superintendent or
> Commissioner (or to procure an article to be delivered, to possess it with

---

[4]      A copy of this regulation is attached hereto as Exhibit B.

intent to deliver it, or deposit or conceal it with intent that an inmate shall obtain it).

(2)  On entering, visitors must disclose to the admitting or searching officer(s) any article they are carrying on their person except the clothes that they are wearing.  Anyone who attempts to carry in or out of the institution any article without the knowledge of the admitting or searching officer(s) shall be liable to arrest and loss of visiting privileges.

103 CMR 483.13.  The Visiting Procedure regulation further provides:

Any visitor, even one who has obtained prior permission to visit, may be denied entrance to the institution or told to terminate a visit and leave the premises.

103 CMR 483.16.

Accordingly, given that there is no constitutional or other absolute right to visitation, Plaintiffs' claim fails.

## VI.    SUPERINTENDENT GELB IS ENTITLED TO DEFERENCE WITH REGARD TO HIS DETERMINATION TO BAR SPRINGER FOR ONE YEAR.

Where there is no state-created liberty interest, courts are to accord prisons wide-ranging deference in the adoption of policies and practices that in their judgment are necessary to preserve institutional order and discipline.  Turner v. Safley, 482 U.S. 78, 89 (1987); Meachum v. Fano, 427 U.S. 215, 225 (1976) (urging that to allow "any substantial deprivation imposed by prison authorities [to] [trigger] the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts.")  That is, the constitutional rights of inmates may be properly limited to accomplish valid penological objectives.  Turner, 482 U.S. at 89.  The policy or practice will pass constitutional scrutiny where the asserted penological objective is to maintain security and prevent criminal conduct.  Id.  See, e.g., Overton v.

Bazzetta, 539 U.S. 126, 131 (2003) (finding that visitor's attempt to introduce drugs into correction facility was "inconsistent with proper incarceration," and upholding prison's suspension of inmate's rights to visitation because it was reasonably related to the penological purpose of increasing the safety of visitors and correctional staff); Thornburgh v. Abbott, 490 U.S. 401, 401 (1989) (authorizing mail censorship centrally concerned with the maintenance of prison order and security).

Institutional considerations, like security and related administrative problems, require that some limitation be placed on the entry of people into prisons for face-to-face communication with inmates. Pell v. Procunier, 417 U.S. 817, 823 (1974). So long as reasonable and effective means of communication remain open and no discrimination in terms of contact is involved, prison officials must be accorded great latitude in drawing these lines. Pell, 417 U.S. at 827. Accordingly, it is not irrational to limit prison visitation where there is evidence of a plan to engage, during such visits, in conduct endangering the facility or security. See id. (citing Jones, 433 U.S. at 125-26).

Preventing the introduction of drugs into the Department's facilities is one of the Department's foremost priorities. One of the ways in which the introduction of drugs occurs is through visitors. In fact, the Department has experienced an increase of drugs and other contraband-related incidents involving visitors. Superintendent Gelb, quoting the Commissioner's statement on the Department's website, states: "Drugs in prison contribute to violence, compromise the health and safety of staff and inmates and hamper inmates' efforts to re-enter society addiction free." Consequently, the Department will now be using narcotic detection dogs in its facilities. (Ex. A, ¶ 3.)

In the case at hand, the Department's records reflect that on June 3, 2012 CO Pierre discovered a bag containing sixty-six orange pills believed to be Suboxone and two additional packages believed to be marijuana on the chair in visit booth # 3 in the SSMU during the 7 p.m. visiting period in which Springer was visiting with Williams in visitor booth # 2 and Visitor One was visiting with another inmate in visit booth # 1. (Compl. ¶¶ 12-13; Ex. A, ¶ 8.)

Based upon the facts as set forth in the Department's records, Superintendent Gelb reasonably believed that Springer and/or Visitor One was/were instrumental in bringing contraband into the facility, given that the SMU visiting rooms were routinely inspected before and after each visiting group.  In addition, the SMU visiting rooms were inspected for contraband and other security issues at the beginning of each shift.  Thus, one of the times that the SSMU visiting room was inspected was *after* the last afternoon visiting period and *before* Springer's and Visitor One's 7 p.m. SSMU visits began.   (Ex. A, ¶ 6.)

The Department's concern with eliminating the introduction of drugs in its prisons is clear.  Because Superintendent Gelb's decision with respect to Springer's and Visitor One's visitation privileges was grounded on these concerns, maintaining institutional security and preventing criminal conduct, he acted under a valid penological objective.   Additionally, Superintendent Gelb reasonably restricted Springer's visitation, because other effective means of communication remained open to Springer and Williams, i.e., telephone calls and mail.  (Ex. A, ¶ 13.)  See Pell at 823.

Accordingly, it was well within Superintendent Gelb's discretion to bar both Springer's and Visitor One's visitation for one year, based upon the seriousness of the

incident, the introduction of drugs into SBCC, and because the matter was still under

investigation. (Ex. A, ¶ 12.)

## VII.    SUPERINTENDENT GELB COMPLIED WITH DEPARTMENTAL REGULATIONS REGARDING VISITATION.

As set forth above, Superintendent Gelb is entitled to deference with regard to

barring Springer's visitation for one year to maintain security and prevent criminal

conduct.  In addition, Superintendent Gelb is in compliance with the Visiting Procedure

regulation.  As reiterated by the Supreme Judicial Court:

> We ordinarily accord an agency's interpretation of its own regulations
> considerable deference unless arbitrary, unreasonable, or inconsistent with
> the plain terms of the regulations themselves.  Warcewicz v. Department
> of Envt'l Protection, 410 Mass. 548, 550, 5734 N.E. 2d 364 (1991).  So
> long as the agency's interpretation of its regulations and statutory mandate
> is rational, and adhered to consistently, it should be respected.  Boston
> Police Superior Officers Fed'n v. Boston, 414 Mass. 458, 462, 6089 N.E.
> 2d 1023 (1993).

Rasheed v. Commissioner of Correction, 446 Mass. 463, 476 (2006).

The language of the Visiting Procedure regulation is clear: the introduction of

contraband or the attempt to introduce contraband is prohibited, resulting in the barring of

visitation and the possibility of criminal charges. 103 CMR 483.13.   Pursuant to both

G.L. c. 127, § 37 and 103 CMR 483.11(2), the superintendent may refuse admission to a

person who has permission to visit if, in the superintendent's opinion, such admission

would be injurious to the best interest of the institution.  Superintendent Gelb did not

restrict Springer from visitation with Williams arbitrarily.  The introduction of these

drugs posed a threat to institutional safety and security and, therefore, Springer and

Visitor One were barred from visiting for one year.  See 103 CMR 483.16.  Accordingly,

absent an affirmative showing by Plaintiffs that Superintendent Gelb barred Springer's

visitation privileges for some improper purpose, Plaintiffs' claim fails.

## VIII.   THE DEPARTMENT OFFICIALS ARE ENTITLED TO QUALIFIED IMMUNITY.

The Department Officials are entitled, as a matter of law, to qualified immunity.

It is well established that "[g]overnmental officials performing discretionary duties

generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person

would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "The contours of

the right must be sufficiently clear that a reasonable official would understand that what

he is doing violates that right ... in the light of pre-existing law the unlawfulness must be

apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1988).  The Supreme Court has

reasoned that "officials can act without fear of harassing litigation only if they can

reasonably anticipate when their conduct may give rise to damages." Davis v. Scheuer,

468 U.S. 182, 192 (1984).

Once a defendant raises a qualified immunity defense, the burden is on the

plaintiff to show that the law was clearly established at the time of the alleged violation.

Dixon v. Richer, 922 F.2d 1456, 1460 (10th Cir. 1991); see, e.g., Duarte v. Healy, 405

Mass. 43, 48 (1989) ("[Plaintiff] must show that it was clearly established that a drug

testing policy, such as the one here at issue, violated the constitutional rights of the

persons being tested.").  If the plaintiff does not meet this initial burden, "the government

official is properly spared the burden and expense of proceeding any further." Powell v.

Mikulecky, 891 F.2d 1454, 1457 (10th Cir. 1989).  "Because qualified immunity is 'an

immunity from suit rather than a mere defense to liability … it is effectively lost if a case

is erroneously permitted to go to trial.'"  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009)

(quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  "Indeed [the Supreme Court

has] made clear that the 'driving force' behind the creation of the qualified immunity

doctrine was a desire to ensure that 'insubstantial claims' against government officials

[will] be resolved prior to discovery.'"  Pearson, 129 S. Ct. at 808 (quoting Anderson,

483 U.S. at 640 n.2); Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 (2009) ("The basic thrust

of the qualified-immunity doctrine is to free officials from the concerns of litigation,

including avoidance of disruptive discovery.") (inner quotations and citations omitted).

    In Pearson, the Supreme Court reiterated the qualified immunity standard and also

dispensed with the requirement, previously set forth in Saucier, that courts resolving the

issue of qualified immunity had to first address whether the facts as alleged demonstrated

a violation of a constitutional right before addressing whether the right at issue was

"clearly established."  129 S. Ct. at 818.  Courts are now free to resolve the issue of

qualified immunity on the second prong of the test, without having to first decide whether

a constitutional violation has been demonstrated, if the court deems it appropriate.  See

id.; Maldonado v. Fontanes, 568 F.3d 263, 269-70 (1st Cir. 2009).

    The second prong concerns whether the constitutional right was clearly

established at the time of the alleged violation and whether a reasonable actor, similarly

situated, would have understood that his conduct violated a clearly established right.

Saucier, 533 U.S. at 194.  Qualified immunity turns on the "objective legal

reasonableness" of the official's action, in light of legal rules that were "clearly

established" at the time the action was taken.  Anderson, 483 U.S. at 639.  Whether an

asserted federal right was clearly established is a question of law, not one of fact.  See

Elder v. Holloway, 510 U.S. 510, 516 (1994); Hegarty v. Somerset County, 53 F.3d

1367, 1373 (1st Cir.), cert. denied, 516 U.S. 1029 (1995).  "It is not enough for the

constitutional right to be 'clearly established' at a highly abstract level; what matters is

whether in the circumstances faced by the official, he should reasonably have understood

that his conduct violated clearly established law."  Ringuette v. City of Fall River, 146

F.3d 1, 5 (1st Cir. 1998) (internal citation omitted).  The inquiry "must be undertaken in

light of the specific context of the case, not as a broad general proposition."  Saucier, 533

U.S. at 200.  While "the exact conduct at issue need not have been held to be unlawful in

order for the law governing an officer's actions to be clearly established, the existing

authority must be such that the unlawfulness of the conduct is manifest."  Wilson v.

Layne, 141 F.3d 111, 114 (4th Cir. 1998); see Souza v. Pina, 53 F.3d 423, 425 (1st Cir.

1995).  "A right is 'clearly established' when it is enunciated by a court of controlling

authority in the defendant's jurisdiction in a case sufficiently similar in its facts such 'that

a reasonable officer could not have believed that his actions were lawful.'"  Blake v.

Murphy, 2009 WL 605820 at *2 (D. Mass. 2009) (quoting Wilson v. Layne, 526 U.S.

603, 617 (1999)).  "In the absence of such guidance, qualified immunity attaches, and the

official is held harmless."  Blake, 2009 WL 605820 at *2 (citing Joyce v. Town of

Tewsksbury, 112 F.3d 19, 22 (1st Cir. 1997)).  As set forth above, there is no

constitutional right to visitation, and Superintendent Gelb acted within his authority in

barring Springer, given the seriousness of the incident, the introduction of drugs into the

institution.  The Department Officials, therefore, are entitled to qualified immunity as a

matter of law.

## CONCLUSION

For the foregoing reasons, the Department Officials respectfully submit that their motion for summary judgment on grounds of qualified immunity and black letter law should be allowed.

Respectfully submitted,

NANCY ANKERS WHITE
Special Assistant Attorney General

DATED:  December 2, 2013

/s/ C. Raye Poole
C. Raye Poole
B.B.O. # 632719
Department of Correction
Legal Division
70 Franklin Street, Suite 600
Boston, MA 02110
(617) 727-3300 ext. 147
CRPoole@doc.state.ma.us

## Certificate of Service

I, C. Raye Poole, counsel for the above named defendants, hereby certify that on this 2nd day of November 2013, I served a copy of the above motion by first class mail, postage prepaid, on the plaintiff, Donald Williams, W-97372, at his last known address, SBCC, P.O. Box 8000, Shirley, MA  01464, and on the plaintiff, Shekeira Springer, at her last known address, 16 Stockton Street, Dorchester, MA  02124.

**/s/ C. Raye Poole**
C. Raye Poole