## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

SHEKEIRA SPRINGER and
DONALD WILLIAMS,

        Plaintiffs,

v.

BRUCE GELB, SUPERINTENDENT OF
SOUZA-BARANOWSKI CORRECTIONAL
CENTER; OSVALDO VIDAL, individually;
LT. NESTOR CRUZ, individually; and
OFFICER JOHN DOE, individually,

        Defendants.

</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

</td><td>

Civil Action No. 13-10083-FDS

**Leave to File Granted on
June 3, 2014**

</td></tr>
</table>

## AMENDED COMPLAINT

Plaintiffs Shekeira Springer and Donald Williams ("Plaintiffs"), by and through their

attorney, hereby make the following allegations on personal knowledge, information, and belief:

## INTRODUCTION

1.     On June 3, 2012, Plaintiff Donald Williams was incarcerated at the Souza-

Baranowski Correctional Center ("SBCC") in the Special Management Unit ("SMU"), which is

a unit for administrative segregation.  Placement in SMU restricts an inmate's visitation

privileges and imposes solitary confinement nearly 23 hours each day.

2.     On this date, Mr. Williams' girlfriend, Plaintiff Shekeira Springer, was banned

from visiting Massachusetts Department of Corrections ("DOC") facilities for one year.  She had

violated no rules, but had the misfortune of visiting Mr. Williams in a no-contact visiting room

on June 3, 2012, when three large bags of drugs were discovered under the countertop of an

adjacent visiting booth. After being detained, questioned, and searched for hours, Ms. Springer

was released after midnight with her visitation privileges revoked.

3.     An investigation failed to reveal any connection between Plaintiffs and the drugs.

Instead, evidence suggested an unrelated culprit. In spite of this, Plaintiffs' appeals to reinstate

visitation were arbitrarily and unconstitutionally denied for no valid penological purpose.

4.     Plaintiffs seek injunctive relief to expunge their records of the false insinuation of

drug smuggling. Plaintiffs also seek a declaratory judgment that the visiting policy applied to

SMU inmates at SBCC violates Massachusetts state regulations. Finally, Plaintiffs seek

compensation for the arbitrary suspension of Ms. Springer's visitation privileges and for the

warrantless search of Ms. Springer's cell phone.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, and 1988, as this action arises under the Constitution and laws of the United States,

including 42 U.S.C. § 1983. The Court has supplemental jurisdiction over state law claims

pursuant to 28 U.S.C. § 1367.

6.     This Court has personal jurisdiction over the Defendants because, upon information

and belief, they are residents of Massachusetts.

7.     Venue in this district is proper under 28 U.S.C. § 1391(b)(1)-(2) because a

substantial part of the events or omissions giving rise to the claim occurred within this district.

## PARTIES

8.     Plaintiff Donald Williams is a prisoner incarcerated at SBCC who has been

detained by the DOC at all times relevant to the allegations in this Complaint.

- 2 -

9.     Plaintiff Shekeira Springer is the girlfriend of Mr. Williams and is a resident of the Dorchester neighborhood of Boston, Massachusetts.[1]

10.     Defendant Bruce Gelb is the Superintendent at SBCC.  He assumed this position after June 8, 2012, when the previous Superintendent Anthony Mendosa was relieved of duty by the Commissioner of DOC.  At all times relevant to this complaint, Mr. Gelb was employed by DOC and acting under color of law.  Mr. Gelb is being sued in his official and individual capacities.

11.     Defendant Osvaldo Vidal is the Deputy Superintendent of Operations at SBCC. At all times relevant to this complaint, Mr. Vidal was employed by DOC and acting under color of law.  Mr. Vidal is being sued in his individual capacity.

12.     Defendant Nestor Cruz is a Lieutenant of the Inner Perimeter Security Squad ("IPS"), which is a specialized police force within DOC.  At all times relevant to this complaint, Lt. Cruz was employed by DOC and acting under color of law.  Lt. Cruz is being sued in his individual capacity.

13.     Defendant John Doe is an individual, unknown to Plaintiffs, employed by either DOC as a Correctional Officer or by the Massachusetts State Police as a Trooper, who conducted a warrantless search on Ms. Springer's cell phone.  At all times relevant to this complaint, John Doe was employed by DOC or the State Police and acting under color of law.  John Doe is being sued in his individual capacity.

---

[1] Previously, Ms. Springer was erroneously styled as Mr. Williams' wife.

ACTIVE/73614445.2

## FACTS

### The Plaintiffs' Relationship

14.    Donald Williams has been in DOC custody since April 22, 2011, except for a few days during which he was held in county jails prior to and immediately following appearances in state superior courts as a criminal defendant.  Since August 16, 2011, Donald Williams has been a resident of SBCC under the oversight of, among others, the Defendants.

15.    At all times relevant to the complaint, Plaintiffs Shekeira Springer and Donald Williams have maintained a committed relationship.

16.    Ms. Springer is mother to two girls, Trinity Noriage, age 6, and Zamiyah Springer, age 3.  Since October 30, 2012, these girls have regularly visited Mr. Williams, who is a father figure to them.

17.    Prior to her suspension on June 3, 2012, Ms. Springer travelled approximately 50 miles from her home in Dorchester to visit Mr. Williams, twice a week, nearly every week, to visit Mr. Williams in SBCC's Special Management Unit ("SMU").  SBCC's policy limits the visits received by inmates held in a SMU to a maximum of two visits weekly.

18.    At SBCC, inmates held in an SMU may only receive "no contact" visits. Ms. Springer was very familiar with this restriction.

### Ms. Springer's Visit of June 3, 2012

19.    On Sunday, June 3, 2012, Shekeira Springer drove from her home in Dorchester to visit Donald Williams, who she knew was only allowed "no contact" visits due to his placement in the SMU.

20.    Ms. Springer arrived at the facility at around 6:30 p.m., where she was processed and searched.  Ms. Springer's shoes were removed and she walked through a metal detector.

- 4 -

The underwire in Ms. Springer's bra set off the metal detector, which it always does when she visits SBCC.

21.     Having set off the metal detector, Ms. Springer had the opportunity to leave the facility, but instead opted to undergo a personal search as she always does. Personal searches are conducted in in the Pedestrian Trap Search Room of SBCC by a correctional employee of the same sex as the visitor. *See* Exhibit 2 (Souza-Baranowski Correctional Center Facility Visiting Policies), at 4. During personal searches, female visitors are required to lift their shirt and shake their bra to show that no contraband is hidden under it. Visitors are also required to run their hands around their waistband to show that nothing is secreted under it. Visitors must generally reverse the pockets of their pants to show they are empty, but the Latino officer who conducted the personal search of Ms. Springer on June 3, 2012 went further and reached inside Ms. Springer's pants pockets. In a personal search, visitors are patted down the entire length of their legs and ankles, and they are required remove their socks and show their bare ankles. The head hair of visitors is examined, and visitors are required to remove any hair bands or clips. The female officer who searched Ms. Springer on June 3, 2012 performed all of these tasks.

22.     After being searched without incident, Ms. Springer was escorted to the South SMU visiting area, which is the no-contact visiting area for the SMU in SBCC's southern wing.

23.     The civilian side of the "no contact" visiting area of South SMU is a small room containing three chairs in front of three separate visiting booths. Each booth has a countertop and glass window facing the inmate's side of the visiting area. A small metal box with pinholes on each side is mounted in each booth so that visitors and inmates can hear each other. Visitors and inmates are therefore sealed off from each other. There is no possibility for a visitor to transfer contraband to a prisoner in the South SMU visiting room.

- 5 -

24.     Ms. Springer was seated in the middle booth of the visiting area (#2), and another woman was seated at the booth closest to the door (#1). The third booth was unoccupied. As usual, after the civilians were seated, the inmates were brought into their side of the visiting area, and Mr. Williams was seated across from Ms. Springer.

25.     At approximately 7:50 pm, when Ms. Springer's hour long visit had nearly concluded, Officer Lesly Pierre entered the visiting area with a third woman to be seated at booth #3. Ofc. Pierre pulled out the chair at booth #3 and discovered a suspicious bag sitting on the seat.

26.     Bag in hand, Ofc. Pierre left the visiting area to report the apparent contraband to Sgt. Gregory Spring, who opened the bag to discover a leafy substance consistent with marijuana and 60 individually wrapped orange pills consistent with the narcotic opiate Suboxone®. Sgt. Spring advised Lt. Peter Peladeau of this discovery, who instructed Sgt. Spring to terminate the visits and strip search all three inmates. This was done.

27.     The strip search of Mr. Williams and the other two inmates located no contraband. Neither did a search of the three inmates' cells.

28.     Upon termination of the visit, Ms. Springer and the woman seated at booth #1 each stated that they had no knowledge of the bag located on the seat of booth #3.

29.     At this point, Ms. Springer and the two other visitors were escorted into the lobby to retrieve their personal items from visitor lockers, which were taken by officers and searched. The women were then separated for questioning. For the next 4 hours, Ms. Springer was held in a secure environment surrounded by about five correctional and/or police officers at any time. She was not allowed to leave until after midnight.

30.     At approximately 8:30 pm—after Ms. Springer and the other visitors were escorted to the lobby—the visiting room was searched for the first time. DOC officers located two

- 6 -

additional bags taped to the underside of the countertop in visiting booth #3. These two bags were secured by tape such as duct tape. Upon information and belief, these two bags closely resembled the first bag discovered by Officer Pierre. All three were about 6 inches long and filled with orange pills and leafy material consistent with marijuana.

31.     At about this time, Ms. Springer and the woman who was sitting at booth #1 were read their Miranda rights.[2]

32.     Ms. Springer was asked if she would consent to a strip search and she agreed.

33.     Each of the two women signed waivers to search their respective cars without warrant. Vehicle searches were performed by State Police Troopers and IPS Officers Carlos Goden and Brian Wozniak to "negative results." Exhibit 1 (Wozniak Incident Report), at 3.

34.     Defendant John Doe, who is unknown to Plaintiffs, searched Ms. Springer's cell phone in detail. Defendant Doe did not ask Ms. Springer for consent to search the contents of her phone. Upon information and belief, Defendant Doe examined all call history, text messages, and photos saved in Ms. Springer's phone. He found nothing suggestive of drug dealing or possession.

35.     Sometime after 9:35 pm, Massachusetts State Trooper Dave Lamberth interviewed Ms. Springer, who stated she did not know where the drugs came from. Her story was consistent with that of the woman sitting at booth #1 who had been interviewed separately and had accompanied Ms. Springer the entire time she was in the South SMU visiting room that day. *See* Exhibit 1, at 2-3.

36.     No contraband was discovered in Ms. Springer's car, on her person, or among her personal effects. Upon information and belief, officers did not locate any tape, plastic bags, significant cash, scales, gloves, pill bottles, prescriptions for narcotics, or anything else suspicious.

---

[2] The visitor who sat at booth #3 was allowed to leave prior to Ms. Springer's questioning. Upon information and belief, this visitor was not sanctioned for the drugs discovered.

ACTIVE/73614445.2

37.    Ms. Springer complied with officer requests without any difficulty because she did not bring any contraband to SBCC. Ms. Springer wanted to clear herself of any involvement so that she could continue to see and support her partner Mr. Williams. Officer Wozniak later noted in his report that Ms. Springer was "cooperative with questioning." Exhibit 1, at 2.

38.    For the 6 hours that Ms. Springer was at SBCC, her friends and family grew increasingly concerned about her wellbeing—especially because Ms. Springer was not allowed to access or answer her cellphone. At around 11:30 pm, she was allowed access to her phone and returned a call from a concerned friend, but Ms. Springer's detention continued.

39.    Ms. Springer was released from SBCC after midnight. She found the interior of her car in a state of disarray, indicating that a thorough search of it had been conducted. Ms. Springer drove home alone without incident, arriving at approximately 2:00 a.m.

40.    Upon release, Ms. Springer was told that she was barred from entering any DOC facility unless given permission by Superintendent Mendonsa. She was further advised that she might receive a letter summons at a future date for drug possession charges.

41.    Ms. Springer was humiliated by the guards and the police, and barred from visitation for no reason. At no time was Ms. Springer placed under arrest.

### *Attempts to Reinstate Ms. Springer's Visiting Privileges*

42.    Upon information and belief, on the next day Defendants Vidal and Lt. Cruz decided that Ms. Springer should be barred for one year, which was affirmed by Superintendent Mendonsa. Upon information and belief, based upon the decision of Defendants Vidal and Cruz, on June 4, 2012 Mr. Mendonsa mailed a formal "Notice of Barred Visitor" to Ms. Springer barring her for a year, allegedly as a result of "Attempt to Introduce Drugs into the Facility." Exhibit 3.

43.    No evidence linking Ms. Springer to the putative drugs was ever provided.

- 8 -

ACTIVE/73614445.2

44.     Ms. Springer appealed for reinstatement to Superintendent Mendonsa on June 11, 2012.  *See* Exhibit 4.  Her request was denied by the new Superintendent, Defendant Bruce Gelb, in a letter dated June 26, 2012.  "This letter is to notify you that your request for reinstatement of visiting privileges is denied as the matter is currently under investigation." Exhibit 5.

45.     On June 5, 2012, Mr. Williams filed a grievance in connection with the suspension, which was denied and subsequently appealed by Mr. Williams.  On July 20, 2012 the appeal was denied for the reason that "[a]t this time the matter is currently pending investigation."  Exhibit 6.

46.     Neither of the Plaintiffs was ever informed of the results of the investigation. However, Ms. Springer was never charged with any crime because she could not be connected to the drugs. Exhibit 7 (Affidavit of Bruce Gelb dated November 22, 2013), at ¶ 14.

***Defendants Knew or Should Have Known Plaintiffs Had No Connection to Contraband***

47.     In fact, at the time Defendant Gelb denied Plaintiffs' appeals, he had access to the information in Officer Bryan Wozniak's memorandum regarding the incident of June 3, 2012 ("Wozniak Incident Report").  This memorandum was further copied to Defendants Vidal and Cruz.  The concluding paragraph of this memorandum strongly suggests Ms. Springer had nothing to do with the drugs found, and that further investigation would be conducted:

> On Monday June 4, 2012 at approximately 1300 hrs. IPS Officer Goden did receive a call from a confidential informant stating that he had heard inmates in J2 talking about the drugs found in the South SMU.  [Redacted] and [redacted] are picking up the drugs in the SSMU. **He stated the package was left there from the afternoon visits and that one of the packages fell from underneath the table landing on the seat which was found by CO [corrections officer] Leslie Pierre during the evening visits while sitting a visitor in VR #3.** This inquiry is ongoing.

Exhibit 1 at 3. The Wozniak Incident Report was first obtained by Plaintiffs as an exhibit to the Defendant's Motion to Dismiss on December 2, 2013.

- 9 -

48.     It is unclear whether the redactions in the Wozniak Incident Report obscure the names of inmates or guards, who—unlike SMU inmates—actually have access to the civilian side of the no-contact visiting room.[3]

49.     It is unknown to Plaintiffs what, if any, additional investigation occurred, but the Defendants had ample opportunity to order or conduct further investigation.

50.     A police officer, such as Officer Wozniak, would know that tips from confidential informants could be evaluated based on the informant's track record, and that such tips could be independently corroborated.  For example, visitation logs and visit request slips could be easily compared against an informant's tip.

51.     A police officer, such as Officer Wozniak, would know to check recorded video for behavior suggestive of drug smuggling efforts.  Activity at SBCC is monitored at all times by approximately 365 cameras.  *See* Exhibit 8 (photograph series by Jessey Dearing, located at http://www.jesseydearing.com/massachusetts-incarceration/).  Upon information and belief, some of these cameras are trained upon the visiting areas at SBCC and others are trained on hallways immediately outside of visiting areas.

52.     A police officer, such as Officer Wozniak, would know that plastic bags could retain fingerprints.  However, fingerprints were never taken from Ms. Springer, although she offered to have them taken on the night of June 3, 2013, and would have voluntarily provided them if subsequently asked by Defendants.

53.     Upon information and belief, the Defendants conducted further investigation into the incident and/or were advised of the results of further investigation.  Upon information and

---

[3] "J2" refers to a different cell block in the general prison population of SBCC—not within South SMU, where Mr. Williams was detained.

- 10 -

belief, further investigation proved that neither Ms. Springer nor Mr. Williams had any connection to the drugs located in SBCC on June 3, 2012.

54.     Thus, upon information and belief, Defendants Gelb, Vidal, and Cruz each received or should have received information showing that Plaintiffs were uninvolved in drug smuggling. In spite of this, Defendants Gelb, Vidal, and Cruz jointly, arbitrarily, and capriciously decided to deny Ms. Springer's request to reinstate visiting privileges.

### Mr. William's Administrative Segregation in SMU

55.     The suspension of Ms. Springer's visitation was particularly difficult on Mr. Williams, who already was already enduring virtual solitary confinement in SMU. Mr. Williams remained confined to SMU for approximately 5 more months—18 months in all.

56.     As of June 3, 2012, Mr. Williams had been confined to SMU almost uninterrupted for over 13 months.  Mr. Williams was first moved into DOC custody from the general population of Suffolk County Jail on April 22, 2011 to serve a 30-35 year sentence for attempted murder and related charges.  Mr. Williams was initially placed in the SMU of the Massachusetts Correctional Institution at Cedar Junction ("MCI Cedar Junction"), and was transferred to SBCC in August 16, 2011.

57.     From the time Mr. Williams entered DOC custody on April 22, 2011 until October 30, 2012, he was held in the Special Management Unit ("SMU") of DOC facilities except for one night he spent in the general population.[4]

58.     Mr. Williams was confined to a solitary cell for 159 out of 168 hours every week during his 18 months in SMU.

---

[4] Upon returning from a county jail in connection with a superior court date, Mr. Williams was uneventfully placed in the general population of SBCC until this "mistake" was abruptly corrected and Mr. Williams was again confined to SMU.

ACTIVE/73614445.2

59.     Inmates in SBCC's SMU have fewer opportunities to communicate with visitors. SMU inmates at SBCC are permitted a maximum of three 20-minute phone calls, two one-hour (no-contact) visits, and three showers each week. Apart from these breaks and "exercise" hours, SMU inmates eat and spend all of their other hours alone in their cells.[5]

60.     Mr. Williams was not placed in the SMU for any disciplinary infraction, which is evidenced by responses from the DOC to his many filed grievances. In response to a grievance Mr. Williams filed on May 25, 2011 concerning his placement in SMU, he was advised that he was being held per "103 CMR 423.08 pending classification." An appeal of this grievance was denied June 16, 2011. See Exhibit 9.

61.     Mr. Williams filed and appealed numerous grievances regarding his long-term non-disciplinary administrative segregation in SMU. All of these grievances and appeals were denied.

### SBCC's Restrictive Visitation Policy Violates Massachusetts Regulations

62.     The Massachusetts regulations concerning SMU state that inmates residing in special management units "shall normally have opportunities for visitation similar to general population unless articulable reasons for withholding such privileges exist. The length and number of visits may be limited due to space, schedules, personnel constraints or when there is a substantial reason to justify limitation." 103 CMR 423.09(1)(e).

63.     However, the written policy of SBCC categorically restricts visitation of all inmates confined to SMU. See Exhibit 2 (Souza-Baranowski Correctional Center Facility Visiting Policies).

64.     In SMU, Mr. Williams was permitted only two weekly visits in no-contact visiting areas, which permit only visitation by only a single adult visitor.

---

[5] For further description of conditions at SBCC's SMU, see LaChance v. Commissioner of Correction, 978 N.E.2d 1199, 1203 (Mass. 2012).

ACTIVE/73614445.2

65.     Similar visitation restrictions have been imposed on Mr. Williams' visits during his subsequent confinements to SMU.  This most recently occurred on February 6, 2014, when Ms. Springer was turned away from a visit because—unbeknownst to her—Mr. Williams had been reassigned to SMU the previous day.  Ms. Spinger's previously-arranged visit for Thursday February 6, 2014 was not permitted because SMU inmates cannot receive non-legal visits on Thursdays.

66.     SMU visiting hours and capacity were and are much more limited than the general population, such that it is substantially more difficult to visit SMU detainees.  Visiting time slots are filled up rapidly because only three simultaneous South SMU visits are allowed, and only for limited one-hour time slots on Sunday, Wednesday, and Friday.

67.     In contrast, inmates in the general population may receive visitors on four different days any particular week, and each 2.5-hour visiting period can accommodate dozens of simultaneous inmate visits whether they are contact or no-contact visits.  General population inmates are allowed three 2.5 hour "contact" visits per week.  Further, up to four persons may visit at the same time—including minors such as Ms. Springer's daughters.

68.     At no time has any reason articulated for restricting Mr. Williams' ability to receive visitors under 103 CMR 423.09(1)(e).  Indeed, in response to a written request from Mr. Williams to arrange a visit with Ms. Springer and her children, then-Superintendent Mendonsa replied with a tautology.  "I cannot support contact visit request based on current SMU status." *See* Exhibit 10 (Mr. Mendonsa's letter to Mr. Williams dated May 16, 2012).

### *Injuries to Plaintiffs*

69.     As a direct result of the Defendants' unconstitutional actions, Ms. Springer sustained the following injuries:  emotional distress; humiliation, indignities and embarrassment; degradation; injury to reputation; and restrictions on her freedom of association.

- 13 -

70.     For a year, Ms. Springer was unable to associate with her long-term boyfriend. Due to the restrictions placed on Mr. Williams in SMU, Ms. Springer was further limited to at most three 20-minute calls per week from Mr. Williams until October 30, 2012.  Some of Mr. Williams' allotted three weekly calls were placed to his defense attorneys because Mr. Williams was still actively preparing for trials on two indictments.  Therefore, due to the combination of her unjustified suspension and Mr. William's unconstitutional long-term administrative segregation in SMU, Ms. Springer had very little access to her chosen life partner.

71.     As a direct result of the Defendants' unconstitutional actions, Mr. Williams sustained the following injuries:  injury to reputation; unjustified restrictions on personal contact, educational opportunity, vocational opportunity, athletic opportunity, and family relations.

72.     Mr. Williams suffered particular hardship because his unconstitutional treatment in long-term administrative segregation was compounded by his inability to receive visits from his chosen life partner and confidant.  Further, the telephone restrictions in SMU dramatically curtained his ability to speak with Ms. Springer telephonically.

73.     Furthermore, upon information and belief, the false drug smuggling plot is written in Mr. William's record, which may adversely affect his placement and conditions during the remainder of his sentence.  In September 2012, Mr. Williams observed a note within a Correctional Program Officer ("CPO") status report sheet, which indicated he was involved in a plot to introduce contraband.  Upon information and belief, such prison records are retained for the duration of an inmate's residence in DOC custody and may be relied upon by classification boards or disciplinary panels to decide the conditions of Mr. Williams' incarceration.

ACTIVE/73614445.2

## CAUSES OF ACTION

### Count I – Ms. Springer's Procedural Due Process Rights (42 U.S.C. § 1983)

***Defendant Gelb's Failure to Review the Suspension Violated Ms. Springer's Procedural Due Process Rights Under the Fourteenth Amendment of the United States Constitution***

74.     Plaintiff Springer hereby incorporates all of the foregoing as if set forth herein and further alleges as follows:

75.     By his policies, practices, acts, or omissions, Defendant Gelb, acting under color of state law, violated Ms. Springer's right to procedural due process as guaranteed by the Fourteenth Amendment of the United States Constitution, as enforceable through 42 U.S.C. § 1983.

76.     By denying Ms. Springer's appeal to reinstate visiting privileges for the sole given reason that the "matter is under investigation," and by failing to re-evaluate or apprise Ms. Springer at the conclusion of supposed investigation, Defendant Gelb violated Ms. Springer's procedural due process rights and effectively negated her regulatory procedural right to appeal her visitation.

77.     As a direct and proximate result of this violation of her procedural due process rights guaranteed by the Fourteenth Amendment, Ms. Springer suffered the injuries and damages set forth above.

### Count II – Search of Ms. Springer's Cell Phone Without Warrant (42 U.S.C. § 1983)

***Defendant John Doe's Search of Ms. Springer's Cell Phone Violated Her Right to Be Free of Unreasonable Search and Seizure Under the Fourth and Fourteenth Amendment of the United States Constitution***

78.     Plaintiff Springer hereby incorporates all of the foregoing as if set forth herein and further alleges as follows:

79.     Defendant John Doe, acting under color of state law, searched Ms. Springer's cell phone and thereby deprived Ms. Springer of her right to be secure against unreasonable searches

- 15 -

and seizure under the Fourth and Fourteenth Amendments of the United States Constitution, as

enforceable through 42 U.S.C. § 1983.

80.     As a direct and proximate result of this unlawful search, Ms. Springer suffered the

injuries and damages set forth above.

Count III – Illegal Visitation Policy (Mass. Gen. Laws ch. 231A)

*SBCC's Restrictive Visitation Policy For SMU Inmates Contravenes 103 CMR 423.09*

81.     Plaintiffs hereby incorporates fully all of the foregoing as if set forth herein and

further allege as follows:

82.     103 CMR 423.09, promulgated pursuant to Mass. Gen. Laws ch. 124, § 1(c) & (q),

states that inmates confined in SMU "shall normally have opportunities for visitation similar to

general population unless articulable reasons for withholding such privileges exist.  The length and

number of visits may be limited due to space, schedules, personnel constraints or when there is a

substantial reason to justify limitation."

83.     As a matter of policy and practice, Defendant Gelb, acting in his official capacity,

has implemented a visiting policy at SBCC in direct contravention of 103 CMR 423.09.

84.     As a result of this visiting policy, Plaintiffs have suffered and continue to suffer

from unlawfully truncated visiting access.  This policy severely limits the ability of Plaintiffs to

see each other when Mr. Williams is held in SMU for non-disciplinary reasons.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

A.     Enter judgment in favor of Plaintiffs and against Defendants on all counts of the
Amended Complaint;

B.     Order that Ms. Springer's DOC suspension record be expunged by the
Superintendent of SBCC in his or her official capacity;

- 16 -

C.   Order that references to the drugs discovered on June 3, 2012 in Mr. Williams
     DOC records, including any classification report, be expunged by the
     Superintendent of SBCC in his or her official capacity;

D.   Declare that suspending Ms. Springer's visiting privileges without cause violates
     the constitutions and laws of the United States and the Commonwealth of
     Massachusetts;

E.   Declare that the visiting policy implemented by the Superintendent of SBCC
     violates 103 CMR 423.09 and Mass. Gen. Laws ch. 124, § 1(c) & (q).

F.   Vacate the denials of Mr. Williams's grievance and Ms. Springer's appeal
     regarding the baseless suspension of Ms. Springer's visiting privileges;

G.   Award damages sufficient to compensate Plaintiffs for violation of their rights
     under the United States Constitution against the Defendants in their individual
     capacity, jointly and severally, in an amount to be determined at trial;

H.   Award to Plaintiffs and against Defendants pre-judgment and post-judgment
     interest on all sums awarded in this action;

I.   Award to Plaintiffs recovery of all costs and expenses concerning this action,
     including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and/or other
     authority; and

J.   Grant any other relief to which Plaintiffs are properly entitled.

## JURY TRIAL DEMAND

PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES AND

CLAIMS SO TRIABLE.


Dated: June 13, 2014                    Respectfully submitted,
                                        Shekeira Springer and Donald Williams,


                                        /s/ M. Frank Bednarz
                                        M. Frank Bednarz (BBO No. 676742)
                                        mbednarz@goodwinprocter.com
                                        GOODWIN PROCTER LLP
                                        Exchange Place
                                        Boston, Massachusetts 02109-2881
                                        Tel: (617) 570-1093
                                        Fax: (617) 523-1231
                                        *Counsel for Plaintiffs*

- 17 -

## CERTIFICATE OF SERVICE

The undersigned certifies that this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies were sent to those indicated as nonregistered participants on June 13, 2014.

/s/ M. Frank Bednarz
M. Frank Bednarz

- 18 -

# EXHIBIT 1



The Commonwealth of Massachusetts
Executive Office of Public Safety & Security
Department of Correction
Souza-Baranowski Correctional Center
P.O. Box 8000
Shirley, MA  01464



**Deval L. Patrick**
*Governor*

**Timothy P. Murray**
*Lieutenant Governor*

**Mary Elizabeth Heffernan**
*Secretary*

*Office #(978) 514-6500*
*Fax: #(978) 514-6529*

**Luis S. Spencer**
*Commissioner*
**Peter A. Pepe, Jr.**
**Katherine A. Chmiel**
*Deputy Commissioners*
**Paul L. DiPaolo**
*Acting Deputy Commissioner*
**Anthony M. Mendonsa**
*Superintendent*

TO:        Anthony Mendonsa, Superintendent

THRU:      Lt. Nestor Cruz, IPS Commander and Douglas Bower, Director of Security and

           Osvaldo Vidal, Deputy Superintendent

FROM:      IPS Officer Bryan Wozniak, SBCC IPS Unit

DATE:      Sunday, June 03, 2012

RE:        Narcotics found in SSMU non-contact VR


On Sunday, June 3, 2012 at approximately 2030 hrs. Lt. Pete Peladeau called me IPS Officer Bryan Wozniak via radio to report to the South Special Management Unit. I met Lt. Peladeau on level 3 where he informed me that a package of what appeared to be Suboxone and Marijuana was found in the visitor side of the non-contact visiting room in the SSMU. Lt. Peladeau and I reported to the SSMU pod where we discussed how we were going to handle removing the three (3) visitors and the three (3) inmates from the area.

At this time I was informed how the package was discovered by Officer Leslie Pierre. Officer Pierre did escort visitor ████ **Visitor 3** ████ from the front lobby to the SSMU to visit inmate ████████ . There were already two (2) visits in progress when Officer Pierre and ██ **Visitor 3** ██ arrived in the visiting room in the SSMU, Officer Pierre pulled the chair out from the visit booth #3 when he discovered a package sitting on top of the chair he just pulled out. Officer Pierre picked up the package and had ████ **Visitor 3** ████ sit down for the visit. The visitors already in the visiting room were ████ **Visitor 1** ████ visiting

inmate ▮▮▮▮▮▮▮▮▮▮▮ in visit booth #1 and Shekeira Springer ▮▮▮▮▮▮ visiting inmate WILLIAMS, Donald W97372 in visit booth #2.

Once informed of how the package was found, I reported to the Inner Perimeter Security Office to call and inform the IPS Commander Nestor Cruz of the situation. IPS Officer Carlos Goden and IPS Officer Wozniak reported to the SSMU to escort the visitors to the lobby in the administration building. Upon arriving at the SSMU I informed **Visitor 1** and Ms. Springer that I needed them to come with me for questioning. Female Officer Jessica DeJesus, Lt. Peladeau and IPS Officer Wozniak escorted the three visitors to the Lobby. **Visitor 3** leaves the property at this time. ▮▮▮▮▮▮ and Ms. Springer are escorted to their lockers to retrieve their belongings before being escorted to the Roll Call Room. Female Officer Maria Montanez and Female Sgt. Heather Lindgren reported to the Roll Call Room to relieve Officer DeJesus. At this time Officer Montanez escorted Ms. Springer to the front lobby area, in order to separate the two suspects.

Lt. Peladeau informed IPS Officers Wozniak and Goden that two (2) more packages were discovered duct taped to the underside of visit booth #3. The packages were reportedly large and full of what appeared to be Marijuana. **At this time IPS Officer Goden reported to the SSMU to take photographs and take control of the evidence.**

Massachusetts State Trooper Dave Lambirth of the Leominster Barracks arrived at Souza Baranowski Correctional Center at approximately 2135 hrs. Trooper Lambirth was informed of the situation. Trooper Lambirth was escorted to the Roll Call Room to interview **Visitor 1**. Trooper Lambirth read **Visitor 1** her Miranda rights and was questioned by Trooper Lambirth and IPS Officer Goden. **Visitor 1** was cooperative and answered all questions, but denied having anything to do with the packages discovered in the SSMU visiting room. **Visitor 1** stated that her and Ms. Springer did exchange phone numbers a few weeks ago and do attend visits at the facility together but take separate vehicles. When asked if she would be willing to submit to a strip search and a search of her vehicle, she agreed and signed Attachment A, Permission to Search Waiver form. **Visitor 1** was escorted out of the Roll Call Room and Ms. Springer was escorted into the Roll Call Room to be interviewed. At this time Trooper Doug Grout arrived at the institution to assist in the investigation. Ms. Springer was read her Miranda rights by Trooper Lambirth. Ms. Springer also was cooperative with questioning and denied any involvement with the package found in the SSMU visiting room. When asked about her

relationship with ███Visitor 1███ she stated that they met while visiting at the facility and they only meet at the facility. Ms. Springer also stated that she exchanged phone numbers a couple weeks ago when ███Visitor 1███ told her she was trying to put together a fundraiser for her husband to pay for attorney fees. Ms. Springer was asked if she would be willing to submit to a strip search and a search of her vehicle. Ms. Springer agreed and signed Attachment A, Permission to Search Waiver form.

At this time Troopers Lambirth and Grout along with IPS Officers Wozniak and Goden proceeded to the S.B.C.C. parking lot to search both vehicles. Both vehicles were searched with negative results. After completing the vehicle search Trooper Mike O'Brien arrived at S.B.C.C. to assist. All evidence was photographed before being turned over to Trooper Lambirth.

At this time ███Visitor 1███ and Ms. Springer were told they were free to leave the property, however they would not be allowed to enter any Department of Correction Facility until they are given permission from Superintendent Anthony Mendonsa. ███Visitor 1███ and Ms. Springer were also advised that they could still receive a summons to appear in court over this matter through the U.S. Mail. Both women left the property without incident. Captain Shelley Williams was informed of the outcome of the incident.

On Monday June 4, 2012 at approximately 1300 hrs. IPS Officer Goden did receive a call from a confidential informant stating that he had heard inmates in J2 talking about the drugs found in the South SMU. ████████████████████████ and ██████ ████████████████████ are picking up the drugs in the SSMU. He stated the package was left there from the afternoon visits and that one of the packages fell from underneath the table landing on the seat which was found by CO Leslie Pierre during the evening visits while sitting a visitor in VR #3. This inquiry is ongoing.

# EXHIBIT 2



The Official Website of the Executive Office of Public Safety and Security

**Public Safety**

🏠 Home › Law Enforcement & Criminal Justice › Prisons › DOC Facilities › State Correctional Facilities Visiting Policies › Souza-Baranowski Correctional Center

# Souza-Baranowski Correctional Center

Visiting Hours | Dress Code

**VISITING HOURS**

General Population - Contact Visits

- Inmates are allowed three (3) visiting periods per week with only one period allowed per day. A maximum of two (2) adults, with four (4) visitors total, may visit an inmate at any one time. For example, the following combinations are authorized; (1) adult and up to (3) children or (2) adults and up to (2) children. Any variation to the authorized number of visitors must be approved in writing as a special visit request. Such requests must be submitted to the Deputy Superintendent of Operations.

- The first visiting period will begin at 1:00 p.m. and end at 3:30 p.m.; the second visiting period will begin at 6:00 p.m. and end at 8:30p.m. Five minutes prior to the ending of a visiting period, the visiting room officer shall announce a 5 minute warning. All visitors and inmates will end their visits during this time period.

- Additional visiting periods for North and South General Population Units have been added, on an alternating schedule, on Sunday 9:00a.m. - 11:00a.m and Wednesday 6:00p.m. - 8:30p.m. The schedule for the additional visiting period is posted in the Lobby and Housing Units.

- If the visiting room becomes crowded, the visits that commenced first will be terminated; however, visits will be at least one (1) hour in duration.

- Visitors will not be allowed to gain entrance between the hours of 2:40-3:30 p.m. and after 8:00pm. The last visitor processed must be in the Pedestrian Trap by 2:30 pm to be allowed entrance for the 1:00 - 3:30 PM visiting session.

- Inmates will be allowed visits according to their housing assignment as indicated below.

| NORTH HOUSING | SOUTH HOUSING |
|---|---|
| Sunday | Tuesday |
| Wednesday | Thursday |
| Friday | Saturday |

*Visiting days and times may be subject to change. Please call the facility to verify visiting schedules.*

There are no visits on Monday unless a holiday falls on that date. Holiday visits will be charged to the inmates' weekly visiting allowance. North and South Housing holiday visits will alternate from the first visiting period, 1:00pm-3:30pm, and the second visiting period, 6:00pm-8:30pm, each holiday. Notices are posted in the Lobby and Housing Units prior to the holiday with the times.

- Counsel and Confidential Contact Rooms

    SBCC's General Population Visiting Room has conference rooms designated as confidential contact visiting areas for use by the inmates and Attorneys (and/or the Attorneys' representatives).

Visiting Hours For Non-Contact General Population Inmates

- The superintendent or his/her designee may at his or her discretion, restrict the visiting privilege of an inmate to the non-contact area. The inmate shall be notified of this action by the superintendent or his/her designee in writing.

- Non-contact visitation will continue until such time that the superintendent or his/her designee determines that resuming general population contact visiting privileges is appropriate. Review of non-contact visitation for general population inmates will occur monthly with a written notice sent to the inmate.

- This specific section is not intended to address non-contact visiting restrictions that are as a result of a sanction imposed by the disciplinary hearing officer.

Visiting Hours For Special Management Unit Inmates

- Inmates housed in the Special Management Unit (SMU) shall receive non-contact visits. For security reasons, due to the location of the SMU, only one adult will be allowed to visit a SMU inmate at a time. The visit will be held in the non-contact visiting area of SMU. Visits must be scheduled 24 hours in advance and will be one (1) hour in duration. Inmates are allowed two (2) visits per week, just as the non-contact visits for general population are. No visit can be scheduled more than ten (10) days in advance. Visitors arriving twenty (20) minutes late for their scheduled visit will not be permitted to visit. Visiting appointments will be made according to the following three day schedule.

   Sunday Wednesday Friday

   9:00am -10:00am --------------------------------------------->

   10:00am-11:00am --------------------------------------------->

   1:00pm-7:00pm--------------------------------------------->

   6:00pm-7:00pm--------------------------------------------->

   7:00pm-8:00pm--------------------------------------------->

   *Visiting days and times may be subject to change. Please call the facility to verify visiting schedules.*

- Visits can be scheduled by calling the sergeant of the North or South SMU Monday through Friday between 8:00 a.m. and 10:00 a.m. or between 6:00 p.m. and 8:00 p.m. Inmates on detention status (disciplinary sanctions) can only receive attorney visits. Attorney visits shall take place in the non-contact visiting rooms.

HSU Inmate Visitation

- Inmates housed in the Health Services Unit (HSU) for medical reasons shall receive visits in the general population visiting room if medically approved. Their visiting periods shall coincide with that of the unit they were assigned to prior to HSU placement. Visitors will be required to schedule an appointment for these visits, on the appropriate day, at least twenty-four (24) hours in advance by calling the HSU sergeant between the hours of 10:00 am and 2:00 pm, Monday through Saturday. Visiting periods cannot be scheduled more than ten (10) days in advance. Scheduling appointments will facilitate availability of escorting staff due to the inmate residing apart from the general population. (See attached schedule for general population visits N/S).

J-1 Unit

- Inmates are allowed three (3) visiting periods per week with only one period allowed per day. A maximum of two (2) adults, with four (4) visitors total, may visit an inmate at any one time. For example, the following combinations are authorized; (1) adult and up to (3) children or (2) adults and up to (2) children. Any variation to the authorized number of visitors must be approved in writing as a special visit request. Such requests must be submitted to the Deputy Superintendent of Operations. Inmates housed in J-1 Sector I and Sector II may be in the visiting room at the same time, however they will not be placed directly next to an inmate from a sector other than the one to which they are

assigned.

- Visits for the J-1 housing unit will take place Tuesday evenings from 6:00 pm to 8:30pm, and Thursday and Saturday Mornings from 9:00 AM to 11:00 AM. Five minutes prior to the ending of a visiting period, the visiting room officer shall announce a 5 minute warning. All visitors and inmates will end their visits during this time period.( *Visiting days and times may be subject to change. Please call the facility to verify visiting schedules.)*

- If the visiting room becomes crowded, the visits that commenced first will be terminated, however, visits will be at least one (1) hour in duration.

- J-1 will have holiday visits from 9am to 11 am.( *Visiting days and times may be subject to change. Please call the facility to verify visiting schedules.)*

- Any visitor who does not conform to appropriate visiting regulations will be barred for the day. Visitors will not have the opportunity to change into appropriate clothing that they may have in the vehicle, etc.

- Inmates are permitted to bring into the visiting room: I.D. Card, wedding band, medical alert necklace/bracelet, one religious medal, and headwear that is religious in nature.

- Visitors are only allowed to visit one (1) inmate housed at SBCC. Exception will be if the visitor is related by blood, i.e., brother, father. Visitors will be required to request permission from the Superintendent in writing if they choose to visit another inmate.

- Visitors are allowed to enter the Visiting Room once a day. Once a visitor leaves the Visiting Room and/or institution, they will not be permitted re-entry.


VISITOR RULES AND PROCESSING PROCEDURES

Inmate Visitor Processing

- Upon entering the institution lobby, all visitors must sign the "Visitor Sign In Sheet" (483p1 Attachment D). Visitors will be issued a "Request to Visit Inmate" form by the Visitor Processing Officer one half-hour (½) prior to the start of visiting hours.

- When the visitor turns in the Request to Visit Inmate form, the Correction Officer must check the form to ensure it has been completed properly. The officer will then check the disciplinary list for loss of visit status, transportation list, and barred visitor list to ensure the visitor should continue the entrance process. The officer shall also ensure the visitor has current photographic identification such as a driver's license, passport or welfare card. The Superintendent may make exceptions to this at his/her discretion.

- When the visitor's name is in the barred visitors book or the inmate being visited is on isolation status or out of the institution, the visitor shall be notified of such by the processing Officer. When there are no discrepancies, the Request to Visit Inmate form shall be stamped with the time, and the unit and process number shall be written on the slip.

- The officer in the visitor processing area then calls visitors by using the visitor sign-in sheet, going in sequence. There will not be more than five (5) visitors called at one time.

- Once the Request to Visit Inmate form is received and approved, the unit in which the inmate is housed will be notified of the visit by the Visiting Room Officer.

- The visitor(s) shall review the visitor information book located in the lobby of the institution to see what is allowed inside the facility i.e., wedding bands, engagement rings, prescription glasses, medical alert bracelets, and will ensure that all other articles have been properly secured. Medical appliance, brace, ace bandages, casts, dressings, and medical alert

3/4/2014 5:26 PM

bracelets/necklaces will be subject to search.

- When the visitor an infant, they will be allowed items listed in Section II (K) of this procedure.

- If a female visitor needs to breast-feed her child during a visit, the visitor must exit the visiting room, and nurse her child in the designated nursing area located in the front lobby. Before the inmate's visitor leaves the visiting room, the Visiting Room Sergeant\OIC will inform her that she will be allowed to return to the visiting room if time permits. The inmate will be placed in the Non-Contact visiting area until the visit returns back to the visiting Room.

- If time permits, upon completion of the baby's feeding, the visitor shall be placed at the top of the visiting process list and be reprocessed through the pedestrian trap.

Entrance Procedures

- Before the visitor enters the processing area, they will be required to remove belts, shoes, and all outer garments, and place them, along with any infant items and locker key, in the container on the table. Any additional items that enter this area will be placed in the provided container and reported to the searching officer. There will be a visual review of each person and a search of all items that enter this area. All garment pockets will be turned inside out. All pockets that cannot be turned inside out will be subject to search by the officer.

- All inmate visitors are required to successfully pass a metal detection search. If the visitor fails the metal detection search a personal search shall be required. The visitor will be given the opportunity to leave prior to the personal search unless provisions provided in 501.04 (D)(4)(e) Inmate Visitors (I) exist. Inmate Visitors shall also be subject to the "personal search of the day". The 7x3 Shift Commander will daily designate a random number as the personal search of the day. This number changes each day. Search of the day will be logged in the Pedestrian Trap log, as well as in the Outer Control IMS log. The visitor will sign their name and the inmate's name they are visiting in the logbook provided. The searching officer will also sign, date, and record the type of search performed.

- **ALL INSTITUTIONAL VISITORS (EXCLUDING LAW ENFORCEMENT OFFICIALS), REGARDLESS OF THE SEARCH OF THE DAY WILL HAVE TO SUCCESSFULLY PASS THROUGH THE METAL DETECTOR.** When the visitor has successfully passed through the metal detector, the visitor will then regain possession of the articles in question. All visitors age ten (10) years old and above will receive a stamp on their inside wrist, as designated daily by the Shift Commander.

Any Visitor who does not successfully pass the metal detector may be subject to the following searches:

- <u>Hand-held scanners</u> may be used to aid in determining the reason why an individual was unable to successfully pass through the walk-through metal detector. Unsatisfactory search results from the scanner search may result in further search methods, such as;

- A <u>personal search</u> shall be required if the visit fails the walk-through and hand-held metal detector. All personal searches will be conducted within the Pedestrian Trap Search Room by a correctional employee of the same sex as the visitor. Prior to the personal search authorization will be requested from the shift commander.

<u>NOTE</u> : In accordance with *103 DOC 501.04 (D.4.e), Inmate Visitors, the visitor must be given the opportunity to leave prior to a personal search unless* :

- The employee has those arrest powers granted by the authority of M.G.L., c. 127, §. 127 and;

- The employee has probable cause to believe that the visitor has committed an arrestable offense; and

- The employee has probable cause to believe that the visitor has seizable evidence concealed on his person.

- Upon failure of the above, staff shall request that the inmate visitor submit to a <u>more extensive search</u>. This search may include removing an article of clothing or up to and including a <u>strip search</u> . *Strip searches may take place only with the approval of the Superintendent or a designee.* Any visitor who is asked to remove any article of clothing or submit to a strip search must read and sign the log located in the processing area. Visitors must be informed that they may leave the institution rather than submit to a more extensive search. Any visitor who refuses a more extensive

search will be denied entry. A report must be submitted to the shift commander explaining the circumstances and outcome of any searches. The report should then be forwarded to the Superintendent.

- Any visitor who refuses to be strip-searched shall be told that she/he may not attempt to visit again until she/he has written permission from the Superintendent or his designee.

- All strip searches shall be conducted in the search room located in the pedestrian trap. Two officers shall be present when a strip search is conducted with at least one of the officers being of the same gender as the visitor being searched. Only Officer(s) of the same gender as the visitor shall be in the search room during the search. If only one officer of the same gender is available the officer of the opposite sex shall remain outside of the room but immediately available should an incident occur.

- Due to the potential for contraband being introduced into the institution via a child's diaper, it will be required that all diapers be changed in the pedestrian trap search room, by the parent (visit), under the supervision of the processing officer. Disposable diapers shall be provided by the institution. If a baby is requiring to wear a cloth diaper for medical reasons, the visiting parent shall be required to show documentation of this (i.e.: Doctor's note). The parent will be required to undo the cloth diaper to allow for examination by the pedestrian trap officer. Also, if an additional cloth diaper is to be brought into the visiting room, the visit shall be required to open it for staff examination. If the child's diaper needs to be changed during the visit, the parent (visit) and child will be escorted to the Pedestrian Trap where the child will be changed in the search room under staff supervision. Visiting room staff, as well as Pedestrian Trap staff shall have a supply of disposable diapers for this purpose.

## General Visiting Procedures

- No visits are allowed for inmates on isolation status. When an inmate is in isolation and cannot receive his visits, every effort will be made to allow the inmate to notify his visit of his non-visiting status. In circumstances in which an inmate cannot make a phone call, at the inmate's request someone from the unit team will notify the visit.

- Carrying guns or other weapons, controlled substances, alcohol, or other contraband items in or out of the institution or on state property is strictly prohibited, and may result in the loss of visiting privilege and/or criminal prosecution.

- Visitors are required to lock their cars and secure personal items either in their car or in a locker available in the Main Lobby.

- Visitors will be allowed to carry out of the visiting room what they brought in with them.

- The pedestrian trap officer will check the hand stamp of all visitors before they exit the institution.

- In the event it is count time and a visit is over, the inmate shall not be allowed to leave until the count is completed.

- In the event the visiting room is at full capacity, visits will be terminated in order by slip number. The first visitors in will be the first visitors terminated, after a one-hour duration.

**NOTE** : **General population visits are designated as limited contact.** The inmate and visitor are allowed a very brief welcoming and departing embrace and closed mouth kiss. The inmate and visitor will sit side by side with their feet on the floor and will maintain correct posture. Inmates and visitors shall be allowed to hold hands. The visitors' and inmates' backs should have contact against the seat backrest. The visitor and inmate will not lay their head on the shoulder or against the head of the other. Rubbing of arms or legs of the other will not be permitted. Conversational voice volume is to be used distracting loudness will not be permitted to disturb other visitors.

## CHILDREN VISITATION

Regulations

- No child who was a victim of the inmate's offense shall be authorized to visit without the authorization of the Commissioner or designee.

- All children (17 years or younger) wishing to visit must be accompanied by an adult in possession of the child's birth certificate. The birth certificate must be an original (long form) and an official document with a raised town seal on it.

- Children accompanied by an adult other than their parent/legal guardian must have written permission from the parent/legal guardian. A Minor Request Form must be filled out and notarized in advance of the visit and sent to the institution for the Superintendent's signature. The visitor must bring the signed/notarized minor consent form and original (long form) birth certificate with them to the visit.

- Children in the visiting area shall be the responsibility of the adult visitor and shall not be allowed to engage in disruptive behavior or the visit will be terminated.

**\*\* NO MINOR MAY BE LEFT UNATTENDED IN ANY AREAS \*\***

**ON STATE PROPERTY INCLUDING BUT NOT LIMITED TO VEHICLES, LOBBY, ETC.**

Children's Area

- The children's area shall consist of four small round tables with chairs at the front of the visiting room. This is to allow supervision by the visiting parent / guardian.

- children's play area shall be supervised by the visiting parent / guardian and the visiting room officers. The visiting parent / guardian shall be responsible for their children's conduct and actions at all times.

- The institution shall provide children's reading material, coloring books, and crayons approved by the Superintendent for the children's play area. These shall remain in the area of the children's play tables at all times during the visiting periods.

- The children's reading materials, coloring books, and crayons shall be secured and stored by the visiting room staff after the visiting period is over.

**BATHROOM FACILITIES**

- Visitors shall notify the Visiting Room officer prior to using the bathroom area. Children under the age of ten (10) must be accompanied by the parent or guardian other than the inmate.

- The officer will unlock the bathroom door and allow the visitor to enter. The officer will remain outside the bathroom door.

- All visitors will be pat searched inside the restroom before being allowed back into the visiting room. Visitors are expected to keep these areas clean.

- The restroom facilities are available for use at the discretion of the Officer in Charge. If in the event the visitor is unable to wait until such time that restroom facilities are available, the visitor has the option to end the visit and leave the institution. The visitor will not be allowed to re-enter the institution for the remainder of the day.

- Inmates and visitors will not be allowed to use the restrooms from ½ hour prior to the end of visits until the visiting period is over.

Souza-Baranowski Correctional Ce... Case 1:13-cv-10083-FDS   Document 90 ...ww.mass.gov/eopss/law-enforce-and-cj/prisons/doc-facilities/doc... Page 30 of 55

Case 1:13-cv-10083-FDS   Document 84-2   Filed 06/13/14   Page 8 of 12

- Inmates are not authorized to utilize restrooms within the visiting room. Inmates may leave the visiting room to use the facilities in his housing unit. He will not be permitted to return to the visiting room.

## FUNDS/CORRESPONDANCE

Visitors may not drop off money deposits during visiting hours. SBCC inmates can only receive funds through the mail. Visitors cannot drop off any correspondence to inmates during visiting hours.

## TRANSPORTATION

Visitor Parking

- All inmate visitors shall park in the visitor's parking area located directly in front of the institution.

- A vehicle should never be left running unless it is occupied. Therefore, the use of remote control or keyless ignition type starters will be prohibited by all inmate visitors in Institution parking lots.

- People who are providing a ride to an inmate's visitor, who are waiting for the visiting period to end, must leave state property.

Public Transportation

The MBTA Train schedule and a taxi telephone numbers listing is posted in the locked cabinet near the payphones in the lobby of the institution.

## RULE VIOLATIONS

- Any violation of visiting rules by inmates may result in disciplinary action and/or loss of visiting privilege.

- Any violation of visiting rules by visitors may result in termination of the visit and loss of visiting privilege.

Visitor Smoking

The smoking, possession or other use of tobacco products by visitors is prohibited in all Department of Correction facilities and on all DOC property.

Visitors Access to Rules and Regulations

A copy of the institutional visiting rules and procedures shall be made available to any visitor who requests one. Along with this, requests for directions to the facility and local transportation information shall be provided (483p1 Attachment C).

## OUTSIDE HOSPITAL VISITS

- Inmates temporarily confined to an outside hospital, other than the Lemuel Shattuck Hospital, will not be allowed visits unless the inmates medically determined to be in critical condition or imminent danger of death.

- Outside Hospital visit requests can be made by contacting the Superintendent's office. Visit approval will be document in writing and forwarded to the Shift Commander. The Shift commander or designee will contact the outside hospital detail with the visit information (i.e. duration of visit, visitor information and any additional special circumstances) this will be documented in the outside hospital detail logbook.

## SPECIAL VISITS

Exceptions to the visiting schedule, duration of visits, the number of people allowed to visit at one time, and/or other requests can be approved under special circumstances. Such requests must be submitted in writing to the Deputy Superintendent of Operations. Special visit approval will be documented in writing and a copy will be sent to the requesting visitor, the inmate, the visitor processing desk and outer control.

**S.B.C.C. GENERAL AND NON CONTACT POPULATION VISITING HOURS**

| DAY | NORTH HOUSING<br>L,M,N,P<br>1&2 | SOUTH HOUSING<br>G,H,J,K<br>1&2 | ALTERNATING<br>NORTH & SOUTH<br>HOUSING |
|---|---|---|---|
| SUNDAY | 1:00 P.M. - 3:30 P.M. /<br>6:00 P.M. - 8:30 P.M. | | 9:00A.M. - 11:00A.M. |
| MONDAY | NO VISITS | NO VISITS | NO VISITS |
| TUESDAY | | 1:00 P.M. - 3:30 P.M. | |
| WEDNESDAY | 1:00 P.M. - 3:30 P.M. | | 6:00 P.M. - 8:30 P.M. |
| THURSDAY | | 1:00 P.M. - 3:30 P.M. /<br>6:00 P.M. - 8:30 P.M. | |
| FRIDAY | 1:00 P.M. - 3:30 P.M. /<br>6:00 P.M. - 8:30 P.M. | | |
| SATURDAY | | 1:00 P.M. - 3:30 P.M. /<br>6:00 P.M. - 8:30 P.M. | |
| HOLIDAYS | | | 1:00 P.M. - 3:30 P.M.<br>6:00 P.M. - 8:30 P.M. |

*Visiting days and times may be subject to change. Please call the facility to verify visiting schedules.*

HOLIDAYS OBSERVED : News Years Day, Martin Luther King Day, Washington's Birthday, Evacuation Day, Patriots Day, Memorial Day, Bunker Hill Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day and Christmas Day. Holiday visits shall rotate between North and South side housing units, Prior to the holiday the scheduled times shall be posted in the housing units and visitor lobby.

A maximum of two (2) adults with, four (4) visitors total (ex: 2 adults and up to 2 children or 1 adult and up to 3 children) will be allowed to visit at any one time. Inmates are allowed three (3) visits per week, one (1) visit per day, including holidays.

If the visiting room becomes crowded, the visit which commenced first will be terminated; however, visits shall be at least one (1) hour in duration. The visiting room shall be cleared of all visits by 11:00 a.m., 3:30 p.m., and then again by 8:30 p.m.

Visitors will not be allowed to gain entrance between 2:40 p.m. and 3:30 p.m., during change of shifts and after 8:00 p.m. The last visitor must be in the pedestrian trap by 2:30 pm.

Visitors are allowed to enter the Visiting Room once a day. Once a visitor leaves the Visiting Room and/or institution, they will not be permitted re-entry.

Money deposits may be mailed to the inmate at the institution. Money deposits may also be dropped off during visits by depositing the in the appropriate box located in the main lobby. Cashiers checks, money orders or postal orders are preferable; however, personal checks will be accepted. There is a seven (7) day hold on all personal checks. **Please do not send cash. We are not responsible for lost cash.**

Alternating additional visiting periods are posted in Visiting Room, Lobby, and Housing Units. The visiting periods are on Sunday from 9:00a.m. - 11:00a.m. and Wednesday from 6:00p.m. - 8:30p.m. and shall rotate between North and South General Population Units.

Souza-Baranowski Correctional Center Case 1:13-cv-10083-FDS   Document 90   Filed 08/01/14 /law-enforce-and-prisons/doc-facilities/doc...

Case 1:13-cv-10083-FDS   Document 84-2   Filed 06/13/14   Page 10 of 12

| DAY | TIME |
|---|---|
| SUNDAY | 9:00 am to 10:00 am / 10:00 am to 11:00 am / 1:00 pm to 2:00 pm / 5:00 pm to 6:00 pm / 6:00 pm to 7:00 pm / 7:00 pm to 8:00 pm |
| MONDAY | NO VISITS |
| TUESDAY | NO VISITS |
| WEDNESDAY | 9:00 am to 10:00 am / 10:00 am to 11:00 am / 1:00 pm to 2:00 pm |
| THURSDAY | NO VISITS |
| FRIDAY | 9:00 am to 10:00 am / 10:00 am to 11:00 am / 1:00 pm to 2:00 pm / 5:00 pm to 6:00 pm / 6:00 pm to 7:00 pm / 7:00 pm to 8:00 pm |
| SATURDAY | NO VISITS |

*Visiting days and times may be subject to change. Please call the facility to verify visiting schedules.*

**ALL VISITS MUST BE SCHEDULED A MINIMUM OF 24 HOURS IN ADVANCE WITH THE S.M.U. UNIT, but not more than 10 days in advance.** Visits can be scheduled by calling the sergeant of the North or South SMU seven days a week between 8:00 a.m. and 10:00 a.m. or between 6:00 p.m. and 8:00 p.m.

Visitors arriving 20 minutes late for their scheduled visit will not be allowed to visit and must reschedule a new visiting period.

Money deposits may be mailed to the inmate at the institution. Money deposits may also be dropped off during visits by depositing the in the appropriate box located in the main lobby., Cashiers checks, money orders or postal orders are preferable; however, personal checks will be accepted. There is a seven (7) day hold on all personal checks. **Please do not send cash.** We are not responsible for lost cash.

For security reasons, due to the location of the SMU in the institution, a maximum of one (1) adult is allowed to visit a SMU inmate at a time. Visits are limited to one (1) hour in duration. SMU inmates, as well as non-contact population visit inmates, are allowed two (2) visiting periods per week.

**S.B.C.C. J-1 VISITING HOURS**

| DAY | TIME |
|---|---|
| SUNDAY | NO VISITS |
| MONDAY | NO VISITS |
| TUESDAY | 6:00 pm - 8:30 pm |
| WEDNESDAY | NO VISITS |
| THURSDAY | 9:00 am - 11:00 am |
| FRIDAY | NO VISITS |
| SATURDAY | 9:00 am - 11:00 am |

*Visiting days and times may be subject to change. Please call the facility to verify visiting schedules.*

**HOLIDAYS OBSERVED:** News Years Day, Martin Luther King Day, Washington's Birthday, Evacuation Day, Patriots Day, Memorial Day, Bunker Hill Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day and Christmas Day.

A maximum of two (2) adults, with four (4) visitors total (ex: 2 adults and up to 2 children or 1 adult and up to 3 children) will be allowed to visit at any one time. Inmates are allowed three (3) visits per week, one per day, including holidays.

Money deposits may be mailed to the inmate at the Institution. Money deposits may also be dropped off during visits by depositing the in the appropriate box located in the main lobby.. Cashiers checks, money orders or postal orders are preferable; however, personal checks will be accepted. There is a seven (7) day hold on all personal checks. **Please do not send cash.** We are not responsible for lost cash.

Holiday visits will occur between 9 to 11 am.

Souza- Baranowski Correctional Center

# VISITOR SIGN-IN SHEET

| Visitor # | Date | Time | VISITOR'S NAME (PLEASE PRINT) | Officer's Initials |
|-----------|------|------|-------------------------------|--------------------|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |

** INMATE VISITORS MUST REGISTER ON THIS FORM AS THEY ENTER THE LOBBY TO ENSURE THE PROCESSING IS CONDUCTED IN THE ORDER IN WHICH THEY ARRIVE.

**At the end of the visiting period, forward completed form to the Visiting Room to be filed with visiting slips.

PHOTOGRAPH SCHEDULE

- Inmates will be allowed to have Digital pictures taken with their visits bi-annually, on the following scheduled holidays:

1. Independence Day

2. Christmas Day

- **If the holiday falls on a weekend day, that Saturday and Sunday shall be the designated photograph days. If the holiday falls on a weekday, the Saturday and Sunday** preceding **the holiday shall be the designated photograph days.**

- There will be no exceptions to this schedule unless deemed necessary for security reasons.

PHOTOGRAPHING PROCESS

- There will be two inmate photographers; a North side inmate for the North housing visits, and a South side inmate for the South housing visits.

- The camera will be set up in the back area of the visiting room, to ensure constant supervision of the inmate worker's handling of the camera.

- Digital pictures taken in the visiting room will be developed at a later date. The pictures will be reviewed and sign by staff prior to being distributed to the inmate. At the time of the photo the inmates name and commitment number will be

placed on a sheet with the corresponding picture number to ensure integrity of the picture (attachment A).

**PHOTOGRAPH REQUESTS**

- Inmates who are requesting to have pictures taken in the visiting room with their visits on scheduled holidays will be required to submit a charge slip to their Unit Team for approval.

- Once all appropriate paper work is turned in, the unit team member shall forward it to the treasurer's office for processing. All paperwork must be turned in to the Treasurer's office by the Wednesday preceding the scheduled holiday.

- Three (3) pictures per inmate will be allowed per visiting period. The cost of the pictures will be 3 for $1.00. The funds MUST come from the inmate's personal account.

**REQUEST PROCESSING**

- Charge slips for inmate photograph requests, shall be processed by the clerk who handles inmate accounts on the Thursday proceeding the scheduled holiday. An inmate intra-fund transaction list shall be generated and enclosed in the locked camera box, along with the appropriate amount of film needed for the holiday period. The visiting room staff shall procure the locked camera box from the Treasurer's office on the Friday afternoon, which proceeds the scheduled holiday. It shall be picked up prior to the commencement of the visiting schedule for that day.

- The camera, any unused film and the inmate sign off sheet shall be locked in the camera box and secured in Inner Control between visiting periods. On the Monday morning following the scheduled holiday, the locked box shall be retrieved from Inner Control by Treatment staff and returned to the Treasurer's office for inventory purposes.

**REFUNDS**

- Refunds to the inmate's personal account for any unused or damaged photographs will be processed in a timely manner.

**RULES FOR PHOTOGRAPHS**

- No hand signs will be allowed during photographing.

- Only one inmate per photograph

- Proper dress required, i.e.: Shirts must be worn.

- No inappropriate actions during photo taking, to include oiling body for photograph.

- Photographs will ONLY be taken for the inmates listed on the intra-fund list enclosed with the camera. **NO EXCEPTIONS.**

- Inmates may ONLY refuse to accept photographs due to operator error.

© 2014 Commonwealth of Massachusetts.

Mass.Gov® is a registered service mark of the Commonwealth of Massachusetts.

Contact Us   Site Policies

# EXHIBIT 3





*The Commonwealth of Massachusetts*
*Executive Office of Public Safety & Security*
*Department of Correction*
*Souza-Baranowski Correctional Center*
*P.O. Box 8000*
*Shirley, MA  01464*

**Deval L. Patrick**
*Governor*

**Timothy P. Murray**
*Lieutenant Governor*

**Mary Elizabeth Heffernan**
*Secretary*

*Office: (978) 514-6500*
*Fax: (978) 514-6529*

**Luis S. Spencer**
*Commissioner*
**Peter A. Pepe, Jr.**
**Katherine A. Chmiel**
*Deputy Commissioners*
**Paul L. DiPaolo**
*Acting Deputy Commissioner*
**Bruce Gelb**
*Superintendent*

June 26, 2012

Shekeira Springer

Dear Ms. Springer:

This letter is to notify you that your request for reinstatement of visiting privileges is denied as the matter is currently under investigation.

You may resubmit your request for reinstatement in writing after June 3, 2013.

I trust this addresses the matter.

Sincerely,

Bruce Gelb
Superintendent

BG/vp

cc:   Inmate File (Donald Williams, W97372)
      File

# EXHIBIT 4

June 11th,2012

Dear Mr. Mendonsa:

On June 3, 2012 I came to your facility to visit my boyfriend, Donald
Williams Jr in the SMU. I arrived at the facility around 6:30 p.m. , where I was
processed and searched. Around 7:00 p.m., I arrived in the SMU area along with
another woman.

While her and I were in our visit an officer came in with another woman for a
third visit he pulled out the chair and found a package sitting on the chair. He
left and then came back and had us all leave the visiting room. I went
downstairs and was asked questions, I was also read my Miranda Rights. I have
nothing to hide, so I signed a waiver form allowing my car and my property to be
searched. While my property was being searched, the officers said that two more
packages were found taped under the desk in the same area the chair was pulled out
from.  After all of this I was told that I am barred from coming to visit my boyfriend.

Mr. Mendonsa, I have been visiting my boyfriend for over a year now, twice a week and I
have been in compliance with all the rules and regulations. I did not do
anything wrong, nor would I risk doing anything wrong to jeopardize me not
seeing my boyfriend. The drugs found were not mine, and anyone could have put
them there. There were other visitors in your facility that were in those booths before
myself and this other woman arrived. I did not attempt to introduce drugs into the facility.
I was barred for no reason and I ask respectfully to have my visits reinstated please.

Thank you for your attention in this matter.

Regards,

Shekeira Springer
DOB
ID #:

Donald Williams Jr W97372

JUN 1 4 2012

# EXHIBIT 5



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety & Security*
*Department of Correction*
*Souza-Baranowski Correctional Center*
*P.O. Box 8000*
*Shirley, MA  01464*

**Deval L. Patrick**
*Governor*

**Timothy P. Murray**
*Lieutenant Governor*

**Mary Elizabeth Heffernan**
*Secretary*

*Office: (978) 514-6500*
*Fax: (978) 514-6529*

**Luis S. Spencer**
*Commissioner*
**Peter A. Pepe, Jr.**
**Katherine A. Chmiel**
*Deputy Commissioners*
**Paul L. DiPaolo**
*Acting Deputy Commissioner*
**Anthony M. Mendonsa**
*Superintendent*

**Notice of Barred Visitor**

June 4, 2012

Ms. Shaekeira Springer
16 Stockton Street
Dorchester, MA 02124

RE: ████████████     ████████████

Dear Ms. Springer:

This letter is to notify you that your visiting privileges are suspended effective **June 3, 2012**. This action is taken as a result of:

### *Attempt to Introduce Drugs into the Facility*

You are hereby restricted from entering this or any other Department of Correction Institution or Facility. You may reapply to the Superintendent for reconsideration after **June 3, 2013**. Should you desire to appeal this action, you may do so in writing to the Superintendent within 15 working days of the receipt of this letter. Such written appeal shall include a detailed narrative describing the incident, and set forth the reason you feel the suspension should be lifted. Should the inmate you visit be transferred during the above period, you must apply to the Superintendent of the new institution/facility for re-instatement of your visiting privileges.

Please contact my office at (978) 514-6500 Ext. 6100 if you have any questions regarding this matter.

Sincerely,

Anthony M. Mendonsa
Superintendent

AM/mo

cc:   Karen Arruda, Special Operations Division
      Visiting Processing
      Outer Control
      Inmate File (Donald Williams, W97372)
      File

# EXHIBIT 6

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF CORRECTION
### INMATE GRIEVANCE FORM
#### FORWARD TO INSTITUTIONAL GRIEVANCE COORDINATOR (IGC)

| | | | | | |
|---|---|---|---|---|---|
| Name | WILLIAMS DONALD | Grievance# | 59845 | Institution | SOUZA-BARANOWSKI |
| Commit No. | W97372 | Housing | J3 | | CORRECTIONAL |
| | | | | Date Of Incident | 20120603 |

Date Of Grievance 20120605

**Complaint**
On the Above dAte My girlfriends rights were Violated in More Ways then oNe by C.O's And Ips. C.o Pierre lcAted some sort of contraband thAt wAs in the Non-Contact visitors room While My girlfriend And Another visitor Were in there. My visit wAs cAncelles 5-10 minutes AFter And My girlfriend wAs brought downstairs. She hAd her privAcy rights violated by Ips. They Went through her cell phone read All her Text messAges And Went through All her pictures. She was Not Allowed to Answer her phone For 4 hours And our Family Members Were Worried. She wAs told Several times thAt they knew she plAced the contrAbAnd there becAuse the rooms Were seArched before And After eAch visit. Then they told her she was barred. After seArching her cAr And phone And Finding Nothing thAt could link her to this ContrAband. She is Not A prisoner so this was Wrong.

**Remedy Requested**
I Would all the NAmes of every officer And Ips thAt were involved. I Also Want some type of Action to be tAken For there Non-professional WAys And I Would like A heAring For My girlfriend regArding the visits.

| | |
|---|---|
| Staff Recipient | O'Dell Pamela M   CPO I |
| Staff Involved | Pierre Lesly   CO I |
| Signature | |

---

## RECEIPT BY INSTITUTIONAL GRIEVANCE COORDINATOR

| | | | |
|---|---|---|---|
| Date Received | 20120615 | Decision Date | 20120626 |
| Signature | O'Dell Pamela M   CPO I | | |
| Final Decision | DENIED | | |

**Decision**
Grievance is denied, issues concerning barred visits are addressed with the Superintendent's office. If your visit is barred, she needs to address her concerns to the Superintendent.

| | | |
|---|---|---|
| Signature | | Date |

Denied grievances may be appealed to the Superintendent within 10 working days of Institution Grievance Coordinator's decision.

---

## INMATE RECEIPT

| | | | | |
|---|---|---|---|---|
| Name | WILLIAMS DONALD | | Institution | SOUZA-BARANOWSKI |
| Commit No. | W97372 | Grievance# 59845 | Date Received | CORRECTIONAL |
| | | | | 20120615 |
| Signature. | O'Dell Pamela M   CPO I | | | |

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF CORRECTION
### INMATE GRIEVANCE APPEAL FORM
### FORWARD TO SUPERINTENDENT

| | | | |
|---|---|---|---|
| Name | WILLIAMS DONALD | Institution | SOUZA-BARANOWSKI CORRECTIONAL |

| | | | | | |
|---|---|---|---|---|---|
| Number | W97372 | Housing J3 | Appeal Date | 29-JUN-12 | Date Of Grievance 05-JUN-12 |
| | | | Appeal Received Date | 09-JUL-12 | |

**Appeal**   Grievance #59845:  I'm Writing in regards to My girlFriend being barred and she never Wrote any rules.  She has Wrote Several letter's to the Superintendant and has called Several times and no one is contacting her back.  She was barred with Several other Visitor's due to some Contraband that was found in the Visiting room but Several of those other Visitors are allowed back in the facility and no one has Contacted My girlfriend (Shekeira Springer) back.

**Remedy Requested**   To at least give My girlfriend (Shekeira Springer) an interview so she can eventually get the barr situation liFted.  due to the Fact she has never and will never violate the rules of the Facility.

**Staff Recipient**   O'Dell Pamela M  CPO I

**Signature**

---

## DECISION BY SUPERINTENDENT

| | | | | | |
|---|---|---|---|---|---|
| Appeal Received Date | 09-JUL-12 | Decision Date | 20-JUL-12 | Decision | DENIED |

**Decision By**   Gelb Bruce I  SUPERINTENDENT

**Reasons**   At this time the matter is currently pending investigation

**Signature**                                         **Date**

---

## INMATE RECEIPT

| | | | |
|---|---|---|---|
| Inmate's Name | WILLIAMS DONALD | Institution | SOUZA-BARANOWSKI CORRECTIONAL |

| | | | |
|---|---|---|---|
| Number | W97372 | Appeal Received Date | 09-JUL-12 |

**Staff Recipient**   O'Dell Pamela M  CPO I

**Superintendent's Signature**

# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 13-10083-FDS

SHEKEIRA WILLIAMS, et al., pro se,
        Plaintiffs,

v.

LUIS SPENCER, et al.,
        Defendants.

### AFFIDAVIT OF BRUCE GELB

I, Bruce Gelb, do hereby depose and state as follows:

1.      I am the Superintendent of Souza-Baranowski Correctional Center ("SBCC"), located in Shirley, Massachusetts. I began my position as the SBCC Superintendent on June 24, 2012. SBCC is currently the only maximum security prison within the Department of Correction ("Department").

2.      The statements contained herein are based upon my personal knowledge and/or my review of the Department's records, which are kept during the normal course of business at SBCC.

3.      Preventing the introduction of drugs into the Department's facilities is one of the Department's foremost priorities. One of the ways in which the introduction of drugs occurs is through visitors. Consequently, in response to an increase of drug and other contraband–related incidents involving visitors, the Department will now be using narcotic detection dogs in its facilities. As set forth in the Commissioner's statement on the Department's website regarding the use of narcotic detection dogs:

> Drugs in prison contribute to violence, compromise the health and safety of staff and inmates and hamper inmates' efforts to re-enter society addiction free. The presence of illegal drugs in DOC facilities encourages further criminal behavior

2

and the disciplinary consequences that result impede inmates' chances for parole and to step down to lower security levels.

(Commissioner's Statement, attached hereto as Ex. 1.)

4.      When an inmate is housed in a Special Management Unit ("SMU"), his visits occur in a non-contact SMU visiting room.

5.      Visits in the SMU visiting rooms are scheduled 24 hours in advance on the following days: Sundays, Wednesdays, and Fridays.  SMU visits occur during the following time periods: 9 a.m. to 10 a.m.; 10 a.m. to 11 a.m.; 1 p.m. to 2 p.m.; 7 p.m. to 8 p.m.; and 8 p.m. to 9 p.m.

6.      At that time, SMU visiting rooms were routinely inspected before and after each visiting group.  In addition, the SMU visiting rooms and other common areas are inspected for contraband and other security issues at the beginning of each shift.   Thus, one of the times that the SMU visiting rooms are inspected is on or about 3 p.m., following shift change, i.e., before the evening SMU visits begin.

7.      On Sunday June 3, 2012 plaintiff Shekeira Springer ("Springer") entered SBCC for a 7 p.m. visit with plaintiff Donald Williams W97372 ("Williams").  (Springer's Visitor Form, attached hereto as Ex. 2.[1])

8.      Because Williams was housed at that time in the J3 SMU, his visit with Springer on that evening occurred in the South-SMU ("SSMU") visiting room.  (Visit Schedule for SSMU for week ending June 9, 2012, attached hereto as Ex. 3.)

9.      The SSMU visiting room has three booths.  Thus, it can accommodate three visits during each time period.  After being processed, the visitors are escorted to the SSMU visiting room by

---

[1]      Criminal Offender Record Information of other inmates; the names and personal data of private citizens; the personal data of Springer; and Intelligence Information have been redacted

3

a Correction Officer. There is no Correction Officer present in the room during the visits.

10.     According to the Department's records, the following transpired: On June 3, 2012 at

approximately 7:50 p.m., two visits were being held in the SSMU.   A female visitor ("Visitor

One") was seated at visit booth # 1 visiting with an inmate.  Springer was seated at booth # 2

visiting with Williams.  The door to the SSMU was closed.  While these two visits were in

progress, Correction Officer Pierre ("CO Pierre") opened the SSMU visiting room door to allow

a third visitor ("Visitor Three") to enter for a visit.  Upon pulling out the chair to booth # 3 for

Visitor Three, CO Pierre observed a package on top of the chair.  He opened the package, which

contained a plastic baggie filled with a green leafy substance (consistent with marijuana) and

two smaller bags with approximately 60 individually wrapped orange pills (consistent with

Suboxone).  The visits were terminated.  Visitor One and Springer were informed by Inner

Perimeter Security ("IPS") Officer Wozniak that they needed to come with him for questioning.

All three visitors were escorted to the lobby.  Visitor Three left the facility.  The State Police

arrived and interviewed Visitor One and Springer individually, with the assistance of IPS

Officers Wozniak and Goden.  Both Visitor One and Springer were read their Miranda rights by

the State Police.  Both denied any involvement in the package found in the SSMU visiting

room.  (Incident Reports and Mem., attached hereto as Ex. 4.)  Both Visitor One and Springer

consented to a search of their vehicles.  Both vehicles were searched with negative results.  (Ex.

4; Springer's waiver forms, attached hereto as Ex. 5.)  Visitor One and Springer were informed

that they were free to leave the institution, however, they would not be allowed to enter any

Department facility until they were given permission from then Superintendent Mendonsa.  (Ex.

from all documents attached as exhibits.

4

4.) A search of the SSMU visiting room resulted in the discovery of two more packages of

contraband taped to the underside of the desk in visiting booth # 3. (Ex. 4; photographs,

attached hereto as Ex. 6.)

11.      As a result of this incident, on June 4, 2012 then Superintendent Mendonsa barred both

Visitor One and Springer from visiting any Department correctional institution or facility for

one year. (Visitor One and Springer's visitation bar letters, attached hereto as Ex. 7.)

12.      Both Visitor One and Springer appealed the visitation bars. On June 26, 2012 I denied

both appeals, based upon the seriousness of the incident, the introduction of drugs into SBCC;

and because the matter was currently under investigation. (Appeals and Superintendent's denial

letters, attached hereto as Ex. 8; Ex. 3.)

13.      On May 6, 2013 Springer resubmitted her request for reinstatement, which I allowed,

effective June 4, 2013. (Springer's request and Superintendent's reinstatement letter, attached

hereto as Ex. 9.)

14.      Because the Department was unable to ascertain who introduced the drugs into the

facility, I did not refer this incident to the District Attorney's Office.

15.      Although Springer was barred from visiting Williams for a period of one year, she and

Williams were able to communicate by way of telephone and/or mail.

Signed under the pains and penalties of perjury this 22nd day of November 2013.

Bruce Gelb

# EXHIBIT 8

Massachusetts Incarceration — Jessey Dearing     http://www.jesseydearing.com/massachusetts-incarceration/

Home (http://jesseydearing.com/)     Film (http://www.jesseydearing.com/category/film/)     Photography (http://www.jesseydearing.com/category/photography/)

Blog (http://www.jesseydearing.com/blog/)     About (http://www.jesseydearing.com/about/)

visual storytelling

# Massachusetts Incarceration



(http://www.jesseydearing.com/massachusetts-incarceration/dearing_xxprisontour_metro-2/)

I worked on this story while I was at *The Boston Globe*. I toured four different prison facilities with reporter, David Abel, to see a supervised view of the Massachusetts prison system. I say supervised because our tour was carefully guided by a public relations representative who was present during all interviews and all locations. We toured the reception center, which is used to place inmates into a category of maximum, medium, or minimum security prison. An inmate, unless their charge is severe, will earn his way from where he is originally placed, to a minimum security prison and ultimately released.

*Prison security officer Kevin Shepard navigates the security camera system at Souza-Baranowski. Approximately 365 cameras monitor inmate activity at all times. Souza-Baranowski is the newest correctional facility located in Massachusetts and is a maximum security prison for male offenders.*



This entry was posted on Tuesday, April 2nd, 2013 at 8:58 pm. It is filed under Blog (http://www.jesseydearing.com/category/blog/), Essays (http://www.jesseydearing.com/category/photographs-essays/), Photography (http://www.jesseydearing.com/category/photography/) and tagged with Boston (http://www.jesseydearing.com/tag/boston/), Editorial (http://www.jesseydearing.com/tag/editorial/), Incarceration (http://www.jesseydearing.com/tag/incarceration/), Massachusetts (http://www.jesseydearing.com/tag/massachusetts/), Maximum Security (http://www.jesseydearing.com/tag/maximum-security/), Minimum Security (http://www.jesseydearing.com/tag/minimum-security/), Prison (http://www.jesseydearing.com/tag/prison/), Souza-Baranowski (http://www.jesseydearing.com/tag/souza-baranowski/). You can follow any responses to this entry through the RSS 2.0 (http://www.jesseydearing.com/massachusetts-incarceration/feed/) feed.

← (http://www.jesseydearing.com/here-is-new-york-1-04-07-2013/)          → (http://www.jesseydearing.com/spilling-over-update/)

Comments are closed.

**ABOUT**

Jessey Dearing a New York-based visual journalist currently working as an associate producer for Talking Eyes Media. He is a photographer, videographer, video editor and project manager.

dearingphotography@gmail.com
910-620-1099

**CREDITS**

Subscribe to entries (http://www.jesseydearing.com /feed/)

Subscribe to comments (http://www.jesseydearing.com /comments/feed/)

All content © 2014 by Jessey Dearing

# EXHIBIT 9

Case 1:13-cv-10083-FDS   Document 44   Filed 06/13/13   Page 2 of 3

# COMMONWEALTH OF MASSACHUSETTS
## DEPARTMENT OF CORRECTION
### INMATE GRIEVANCE FORM
### FORWARD TO INSTITUTIONAL GRIEVANCE COORDINATOR (IGC)

| | | | | |
|---|---|---|---|---|
| Name | WILLIAMS DONALD | Grievance# 52885 | Institution | MCI CEDAR JUNCTION |
| Commit No. | W97372 | Housing TEN BLOCK | Date Of Incident 20110422 | Date Of Grievance 20110524 |

**Complaint**  I am writing because I'm being housed in 10 Block for an indetermine amount of time without a hearing. I have no tickets and was told I'm down here until classification. I have been classed 18 days and still haven't been removed. Now I'm being told I'm here until I get transferred. In Haverty v. Commisioner of Corr., It was determined that it is illegal to hold a prisoner in solitary confinement for a indefinite period of time for non-disciplinary reasons.

**Remedy Requested**  I would like to be released or shipped out to another facility.

**Staff Recipient**  Stork Robert E   CO II

**Staff Involved**  _____

**Signature**  _____

---

## RECEIPT BY INSTITUTIONAL GRIEVANCE COORDINATOR

**Date Received** 20110525   **Decision Date** 20110601

**Signature**  Stork Robert E   CO II

**Final Decision**  DENIED

**Decision**  Pursuant to 103 CMR 423.08, you are administratively housed in the SMU pending classification decision and transfer.   Your continued placement in the SMU while awaiting this process is appropriate.

**Signature**  [signature]   **Date** 6/1/11

Denied grievances may be appealed to the Superintendent within 10 working days of Institution Grievance Coordinator's decision.

---

## INMATE RECEIPT

| | | | | |
|---|---|---|---|---|
| Name | WILLIAMS DONALD | | Institution | MCI CEDAR JUNCTION |
| Commit No. | W97372 | Grievance# 52885 | Date Received | 20110525 |

**Signature.**  Stork Robert E   CO II

805

# COMMONWEALTH OF MASSACHUSETTS

## DEPARTMENT OF CORRECTION

### INMATE GRIEVANCE APPEAL FORM

### FORWARD TO SUPERINTENDENT

| | | | |
|---|---|---|---|
| **Name** | WILLIAMS DONALD | **Institution** | MCI CEDAR JUNCTION |
| **Number** | W97372   **Housing** TEN BLOCK | **Appeal Date** 03-JUN-11 | **Date Of Grievance** 24-MAY-11 |
| | | **Appeal Received Date** 13-JUN-11 | |

**Appeal**
I am being held in 10 Block And have been hel since April 22 2011. I was never told why other than my Grievance being denied And it stating that I'm being "administratively housed in SMU pending transfer!' I never had a hearing on Anything About this. This is highly illegal, due to that facts I'm being denied things I'm entitled to. I've seen 2 cases (Edmond Lachance v; Harold Clarke & 1,2,3 others) and (Haverty V. Commisioner) And the state has lose Both of thes.
My situation is identical to both of those.

**Remedy Requested**
To be released From 10 Block or giving the things I'm entitled to.

**Staff Recipient**
Stork Robert E   CO II

**Signature**

---

## DECISION BY SUPERINTENDENT

| | | | | | |
|---|---|---|---|---|---|
| **Appeal Received Date** | 13-JUN-11 | **Decision Date** | 16-JUN-11 | **Decision** | DENIED |

**Decision By**   Hallett Allison   *Acting* SUPERINTENDENT

**Reasons**
I concur with the IGC.  Furthermore, you have already grieved this matter in grievance 52574 on May 4, 2011 and your grievance was denied.  You also appealed grievance 52574 on May 27, 2011 and I have denied that appeal.

**Signature**
I will at this time reiterate that you are being Administratively held in SMU based upon security concerns and pursuant to 103 CMR 423 Special Management and (423.08F)

*Allison Hallett*   **Date** June 16 2011

---

## INMATE RECEIPT

| | | | |
|---|---|---|---|
| **Inmate's Name** | WILLIAMS DONALD | **Institution** | MCI CEDAR JUNCTION |
| **Number** | W97372 | **Appeal Received Date** | 13-JUN-11 |
| **Staff Recipient** | Stork Robert E   CO II | | |

**Superintendent's Signature**

# EXHIBIT 10



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety & Security*
*Department of Correction*
*Souza-Baranowski Correctional Center*
*P.O. Box 8000*
*Shirley, MA  01464*



**Deval L. Patrick**
*Governor*

**Timothy P. Murray**
*Lieutenant Governor*

**Mary Elizabeth Heffernan**
*Secretary*

**Luis S. Spencer**
*Commissioner*
**Peter A. Pepe, Jr.**
**Katherine A. Chmiel**
*Deputy Commissioners*
**Paul L. DiPaolo**
*Acting Deputy Commissioner*
**Anthony M. Mendonsa**
*Superintendent*

*Office #(978) 514-6500*
*Fax:  #(978) 514-6529*

May 16, 2012

Donald Williams, W97372 (J3/15)
Souza-Baranowski Correctional Center
P.O. Box 8000
Shirley, MA  01464

Dear Mr. Williams:

I have reviewed your letter regarding your request for a special visit.  I cannot support contact visit request based on current SMU status.  Your request is denied at this time.

Sincerely,

Anthony M. Mendonsa
Superintendent

AM/lm

cc:     Inmate File
        File